WHITE EAGLE POLISH AMERICAN BUILDING & LOAN ASSOCIATION *v.* CANTON LUMBER COMPANY ET AL.

[No. 48, October Term, 1934.]

*Decided December 14th, 1934.*
*Decision on reargument, April 3rd, 1935.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, PARKE, and SLOAN, JJ.

*Raymond M. Duvall,* for the appellant.

*W. Conwell Smith,* with whom were *Charles E. Cockey* and *Cornelius V. Roe,* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The Hart-Miller Islands Company, a body corporate, one of the appellees, executed unto the appellant, the

White Eagle Polish American Building & Loan Association of Baltimore City, three mortgages; the first executed on August 26th, 1926, to secure a loan of $37,000, the second, executed on August 16th, 1927, to secure a loan of $8,000, and the third, executed on March 24th, 1930, to secure a loan of $30,000. These mortgages were recorded on August 26th, 1926, August 19th, 1927, and April 1st, 1930, respectively.

The Hart Miller Islands Company defaulted in its compliance with the terms and covenants contained in the mortgages, and, on December 16th, 1930, mortgage foreclosure proceedings were instituted upon the three mortgages for the sale of the lands embraced therein. At that time, as disclosed by the statement filed by the mortgagee, there was due upon the mortgages the sum of $62,442.18. The property was sold in the proceedings so instituted by Frank E. Poffel, the attorney named in the mortgages, at and for the sum of $40,500. The appellant, the building and loan association, being the highest bidder therefor, became the purchaser of the property. The sale was reported to the court and, after exceptions had been filed thereto by the Canton Lumber Company, one of the appellees, and evidence heard thereon, the sale was finally ratified and confirmed.

Before distribution of the money was made, the Canton Lumber Company filed its petition, in which it alleged that it, on September 25th, 1930, had filed its mechanics' lien claim for $6,911.62, against a building located on the land conveyed by the mortgages and which was sold under the foreclosure proceedings. The petition alleged that the third mortgage, executed on March 24th, 1930, for $30,000, was to secure future advances to be made from time to time by the building and loan association to the mortgagor, in payment of construction work, aggregating approximately $30,000. It further alleged "that said third mortgage was not a 'participating' mortgage made by the building association to one of its members, and for that reason requiring the repayment of an un-

certain sum of money at an uncertain time, but was made to secure a building on construction loan of definite amount, to wit: thirty thousand dollars, the same to be repaid with interest at the expiration of a definite period." It was then alleged that such third mortgage was invalid so far as it affected the petitioner's claim, in that it was in conflict with, or in violation of, the provisions of section 2 of article 66 of the Code of Public General Laws of Maryland, inasmuch as it did not "state the amount or amounts of the future loans or advances which it was intended to secure" and alleged that, because of such violation of the statute, the mortgage "should be set aside" and that in the distribution of the proceeds of sale the mechanics' lien should be preferred over the claim of the building and loan association under its third mortgage.

An answer was filed to the petition by the appellant, the mortgagee, and evidence was taken, upon which the court passed its order or decree, dated the 28th day of February, 1934, to the effect "that the mechanics' lien claim * * * be and it is hereby preferred to the claim of the third mortgage * * * and in the distribution of the surplus" the mechanics' lien claim of the Canton Lumber Company shall be preferred over the claim of the building and loan association under its third mortgage. It was from this order or decree that this appeal was taken.

The appellant is a building and loan association, incorporated for the purposes, as stated in its charter, "of providing for its members a safe and secure investment for their earnings, for loaning such members upon such security as may be provided for by the by-laws, funds to enable them to purchase homes, for the buying, selling, mortgaging, leasing or otherwise dealing in real or leasehold property in the State of Maryland, and for all those purposes which are usual and proper to be exercised of building and homestead associations under the Public General Laws of the State of Maryland, and that the said corporation is formed upon the articles, conditions and provisions herein expressed and subject in all par-

ticulars to the limitations relating to corporations which are contained in the General Laws of this State."

In the third mortgage, the one in question in this case, is found this statement, "whereas, the said mortgagor being member of the said body corporate has received therefrom an advance of thirty thousand ($30,000.00) dollars, on three hundred shares of stock, the due execution of this mortgage having been a condition precedent to the granting of said advance." Then follows the granting clause, which is followed by a provision authorizing the sale of the property in case of default in any of the covenants therein contained. Among the covenants is the following: "The said mortgagor for itself covenants with the said mortgagee, its successors and assigns to pay and perform as follows; that it to pay weekly to the said mortgagee, its successors, or assigns, the sum of seventy-five dollars as dues until the said sum of thirty thousand dollars shall be repaid; and also to pay weekly, at the time and place specified by the mortgagee, the sum of thirty-six dollars as interest until the sum of one hundred dollars shall be repaid in weekly dues, when the said weekly payments of interest shall be reduced twelve cents; and so on, and as often as one hundred dollars shall be so repaid in dues, the weekly payments shall be so reduced twelve cents; to pay all fines and penalties that may be imposed upon it by said mortgagee in accordance with its charter, constitution or by-laws, which by-laws are hereby made a part hereof: to pay all taxes and water rent, and other public dues and charges for which the property hereby mortgaged is now or may become liable, when payable."

Although the mortgage contains the aforegoing acknowledgment by the mortgagor of the receipt of the $30,000, at the time of the execution of the mortgage, the whole of this amount was not then actually paid. Only the sum of $2,520.25 was then paid to the mortgagor, but, in accordance with an agreement made by and between the mortgagor and the mortgagee, contemporaneous with the execution and delivery of the mortgage, it was agreed

that the balance of the $30,000 should be retained by the mortgagee and credited to the mortgagor upon the books of the building and loan association, to be used from time to time in payment of the construction work upon the mortgaged property, when and as the work was done and approved by the mortgagor, and the building and loan association authorized by it to pay the same. This is shown not only by the agreement contained in the record, but by a letter found therein from the mortgagor to the mortgagee, in which it is said: "With reference to the loan of $30,000, made to us by you, and secured by mortgage on our real estate at Swan Point, Hart and Miller Islands, it is understood that you are to retain the proceeds of this loan and disburse the same as the work" therein mentioned "progresses. As bills are rendered after the necessary work has been performed to certain degrees, we will O. K. the same if the work has been done by the contractors to our satisfaction and authorize you to pay same. After the work has been completed and all bills paid you may either apply the surplus remaining on your mortgage or pay over same to us for the company's use."

Under this agreement the mortgagor, through those with whom it had contracted, proceeded with the work, mentioned in the aforesaid letter, which was to be paid for out of the $30,000 borrowed. The building and loan association made the following disbursements:

| | |
|---|---|
| Mar. 24, 1930 | $ 2,520.25 |
| Apr. 5 | 3,000.00 |
| Apr. 14 | 2,500.00 |
| Apr. 23 | 4,000.00 |
| Apr. 24 | 600.00 |
| Apr. 28 | 1,000.00 |
| Apr. 29 | 500.00 |
| May 6 | 2,200.00 |
| May 12 | 2,879.75 |
| May 19 | 1,000.00 |
| May 20 | 1,100.00 |

| | |
|---|---:|
| May 23 | 500.00 |
| May 26 | 750.00 |
| May 27 | 2,200.00 |
| June 2 | 2,700.00 |
| June 3 | 300.00 |
| June 9 | 2,250.00 |
| | $30,000.00 |

During the period in which the work was being done and the payments made therefor, the appellee, the Canton Lumber Company, sold and delivered unto the Hart Miller Islands Company, mortgagor, lumber totaling the sum of $8,480.02, less credits of April 29th, 1930, $68.40, for materials returned and payment of July 2nd, 1930, of $500, July 30th, 1930, $1,000, leaving a balance of $6,911.62.

On September 25th, 1930, the Canton Lumber Company filed its mechanics' lien, which was recorded among the lien records of Baltimore County, for the sum of $6,911.62.

It will be observed from the aforegoing statement that the mortgage was executed on the 24th day of March, 1930, and that on or before the 29th day of April, 1930, the day upon which the first sale and delivery of lumber was made by the Canton Lumber Company to the mortgagor, there had been paid by the building and loan association, out of the funds retained by it, including the cash payment of $2,520.25, made on the date of the execution of the mortgage, the sum of $14,120.25. Thereafter, the building and loan association, by payments made by it in accordance with the aforegoing agreement, disbursed the entire balance of the $30,000. On September 25th, 1930, the Canton Lumber Company filed its mechanics' lien.

The evidence discloses that the Canton Lumber Company, before making sale and delivery of its lumber to the mortgagor, obtained from either Dunn or Bradstreet reports of the financial condition of the Hart Miller

Islands Company, which showed "a large equity in their holdings in Hart-Miller Islands, or with the Hart Miller Islands Company." These reports likewise showed the existence of the three mortgages upon said land, executed to the building and loan association, aggregating the sum of $75,000. The general manager of the Canton Lumber Company was asked: "At the time of receiving this Dunn and Bradstreet report which you testified about that it showed mortgages, did you make any investigation as to these mortgages, the amounts, and whether or not they were recorded? No, I did not; my recollection is that the total assets that that report showed, the mortgages were of such a small amount that we never even considered them a factor in the case. If my recollection serves me correct, the Hart Miller Islands on that report showed a net worth of close to $200,000."

It will be seen that the Canton Lumber Company had both actual and constructive notice of the existence of the mortgages to the building and loan association, at and before the beginning of the sales and deliveries of the lumber by them to the Hart Miller Islands Company.

The facts stated, consisting of the agreement in relation to the retention by the mortgagee of the money loaned by it to the mortgagor, the credit given to the latter for the amount so retained, and the disbursement of that money, in the manner stated, as well as the facts given in relation to the mechanics' lien, stating the times when the sales and deliveries were made, the knowledge by the Canton Lumber Company of the existence of the mortgages, and the fact that credit was given for the lumber sold and delivered to the Hart Miller Islands Company upon the financial reports received by it, without regard to the mortgages, which were not regarded by it as a factor at all in the decision of the question whether or not credit should be given, are here mentioned to show the absolute freedom of fraud and wrongdoing on the part of the building and loan association in connection with its negotiations and dealings here involved, as well as to show that the Canton Lumber Company was in no wise

wrongfully injured by the acts of the building and loan association of which it complained.

These facts so shown are, we think, essential in distinguishing the cases relied on by the Canton Lumber Company from the case before us.

This case is controlled and governed by the decision of this court in *New Balto. Loan & Savings Assn. v. Tracey*, 142 Md. 211, 120 A. 441, in which the opinion was written by Chief Judge Boyd. In that case Tracey, the appellant, arranged with the Manhattan Land Corporation to purchase from it three lots of ground, upon each of which he was to erect a house to cost $6,500. Tracey, it seems, did not have the money either to pay for the lots or to erect the buildings thereon. To raise the sum of $19,500, he and his wife, on November 22nd, 1919, executed unto the loan and savings association three mortgages, each for the sum of $6,500, on each of the three lots; and to provide for the payment of the purchase money, $3,500, he, on the same day, gave to the Manhattan Land Corporation a second mortgage for that amount, that corporation having on that day conveyed the lots to Tracey and his wife. On the 13th day of July, 1920, the mortgagor having defaulted in the covenants and conditions contained in the three mortgages to the loan and savings association, separate proceedings were instituted for the sale of the mortgaged premises, and sales were made by John H. Richardson, who was appointed trustee. As stated by Judge Boyd. "The evidence in this case shows that when the mortgages were given Tracey was credited by the appellant with the full amount of them, which he deposited with the mortgagee, and it was agreed between Tracey and John H. Richardson, representing the association, as was found by this court in [*Manhattan Land Corp. v. New Baltimore Loan & Savings Assn.*] 138 Md. [529, 114 A. 469] * * * that as the work on the houses progressed, certain amounts were to be paid on the approval of Mr. Richardson. They were admittedly so paid to Mr. Richter, the builder, up to the sum of $3,900 on each house. In the meantime Richter was at work completing the houses

in accordance with the contract between him and Tracey. * * * 'The work was to be done under the direction of Dewitz and Webb, architects and engineers, and the owner, and their decision as to the true construction and meaning of the drawings and specifications should be final.' On May 18th, 1920, Messrs. Dewitz and Webb addressed a communication to Mr. Richardson, stating that Christian F. Richter had completed the three cottages * * * in accordance with the terms of his contract." He also addressed a like communication to Mr. Tracey. "Mr. Richter took the certificate to Mr. Richardson, and he told him he would not give him the money without Tracey being there." After some controversy, arrangements were made by which Mr. Richardson gave to Mr. Tracey three checks, each for the sum of $2,600, representing the balance of the money remaining in the hands of the association. These Tracey indorsed to Richter and Richter indorsed them back to the association under the new agreement.

The facts and circumstances of that case are very similar to the facts of this case. In that case, as in this case, the money was left with the association to the credit of the mortgagor, to be expended in improvements upon the mortgaged premises, which were to be paid for from time to time upon the approval of the work by the mortgagor and Richardson; in this case upon the approval of the mortgagor and Poffel, who occupied about the same relations to the parties in this case, as Richardson did in that case. Thereafter, the controversy referred to occurred and, after further negotiations, it was agreed that the association should give to Tracey three checks, each for the amount of $2,600, making a total of $7,800, the unpaid amount of the consideration of the three mortgages. Tracey indorsed these checks to Richter, and Richter indorsed them back to the association under their agreement. Until the controversy in that case occurred, all the facts as to the retention of the money by the mortgagee and the disbursement of it were like those in this case. The only difference in the two cases occurred thereafter,

when the association gave checks to the mortgagor, which were at once turned back to the association by indorsement. The fact that this was done, which applied only to a part of the consideration of the mortgages, could have had no material effect in the decision of that case. In this case, the whole consideration of the mortgages, less the cash payment of $2,520.25, was left with the mortgagee to the credit of the mortgagor, to be disbursed and treated in the manner stated, while in the *Tracey* case, the major part of the money loaned to the mortgagor was likewise retained by the mortgagee to the credit of the mortgagor. It was only a part of the consideration for which checks were given, which, by indorsement, as we have said, went back to the association. The mere giving of the checks and their simultaneous indorsement back to the mortgagee, placing the fund in the same condition as it was before, could not and should not have the effect of distinguishing these cases.

The evidence in this case, we think, fully establishes the fact that, at the time of the execution of the mortgage, credit was given to the mortgagor by the mortgagee for the full amount of the consideration of the mortgage. This is shown by the letter of the mortgagor to the mortgagee and the subsequent dealings of the parties. In the letter, the mortgagor tells the mortgagee, "With reference to the loan of thirty thousand dollars made to us by you and secured by mortgage on our real estate * * * it is understood that you are to retain the proceeds of this loan and disburse the same as the work * * * progresses. As bills are rendered after the necessary work has been performed, we will O. K. the same if the work has been done by the contractors to our satisfaction and authorize you to pay same." The letter then proceeds: "After the work has been completed and all bills paid you may either apply the surplus remaining on your mortgage or pay over same to us for the company's use." The concluding part of the letter clearly shows that the money was retained or held by the mortgagee, as the money of the mortgagor, upon the conditions named in the agree-

ment between them. The mortgagee was told that, after the work was completed, he might either apply the surplus remaining on the mortgage, or pay it over to the mortgagor. What was meant by surplus? It was what was left of a specified stated sum, which sum was no other than the $30,000 that had been retained and held by the mortgagee under the aforesaid agreement. The only sum or amount named in the mortgage is $30,000. Nowhere in the mortgage is there any mention of any future advance, nor do we think the evidence indicates that there were in the minds of the parties any future advances to be made.

The case of *Balto. High Grade Brick Co. v. Amos,* 95 Md. 571, 52 A. 582, 53 A. 148, and *Groh v. Cohen,* 158 Md. 638, 149 A. 459, 461, and other cases, have been cited by the appellee in support of its contention. It will be seen, however, upon examination of those cases, that the facts in them differ materially from the facts of the case before us. In *Groh v. Cohen, supra,* Judge Urner distinguished that case from the *New Balto. Loan & Savings Assn. v. Tracey, supra,* and *Western National Bank v. Jenkins,* 131 Md. 239, 101 A. 667, by stating: "The amounts of the mortgage loans were paid to the mortgagors, but contemporaneous provisions were made for the future application of the funds, for the mortgagees' protection, in the improvement of the mortgaged property." This case, too, may be distinguished from *Groh v. Cohen, supra,* for the same reasons.

It was said by Chief Judge Boyd in *New Balto. Loan & Savings Assn. v. Tracey, supra*: "In *Western Nat. Bank v. Jenkins, supra,* the case of the *Balto. High Grade Brick Co. v. Amos* was said to be 'wholly and entirely different from the facts appearing in this record,' as it undoubtedly was. It would be difficult sometimes to arrange for buildings to be erected, if something of the kind done in that case and in this could not be done." It may further be said that building and loan associations, when properly conducted, are helpful to many persons in enabling them to acquire homes of their own, which they otherwise

would not be able to do. It is only when such associations exceed their chartered powers and do things not contemplated or authorized by their charters, that they should be condemned.

In our opinion, section 2 of article 66 of the Code has no application to this case.

There is found in the record a motion to dismiss the appeal in this case. It is alleged in the motion that Saturday, April 28th, 1934, the following day being Sunday, was the last day upon which the order for an appeal could have been filed. The clerk's office in Baltimore County on Saturdays closes at about noon. On that day the appellant's attorney telephoned to Mr. Jenifer, the equity clerk, and requested him to accept a paper for filing. Mr. Jenifer suggested that he call Mr. Creaghan, the law clerk. Mr. Creaghan was then called, and he met the attorney at the courthouse, in the evening of that day, and accepted from him the order for appeal. It was by Mr. Creaghan stamped filed as of April 28th, and laid on Mr. Jenifer's desk. He did not enter it on the docket. Mr. Jenifer found the order on his desk on the following Monday morning, April 30th, 1934, and entered it on his docket as of that day. His attention was afterwards called to the fact that the paper had been marked as filed April 28th, and he then changed the docket entry to read April 28th. The attention of the trial court was called to this fact, and it was requested to order that the docket entry be corrected to show that the appeal was entered on April 30th, 1934. The court refused this request and ordered that the petition be dismissed.

We discover in these facts nothing to justify the dismissal of this appeal. The written order for an appeal was handed or delivered to one of the deputy clerks at the office of the clerk on April 28th, 1934, within the time in which the appeal could be taken, and it was by him marked filed as of that date, by stamping the same upon the back of the order. He, not being the regular equity clerk, did not enter it upon the docket. On Monday following, Mr. Jenifer, the equity clerk, entered it upon his

docket as filed on April 30th, and not of the 28th, the day upon which the order was left and filed at the office. Upon his attention being called to the fact that it was filed on the 28th, he corrected the entry on his docket, so as to make it conform to the date upon which it was actually filed, April 28th. Had it remained on the docket as filed on the 30th, the entry would have been inconsistent with the notation upon the back of the written order, and with the actual facts, and he very properly corrected this entry, so as to make it conform to the real facts. *Cahill v. Baltimore,* 93 Md. page 233, 48 A. 705; *Maryland, D. & V. R. Co. v. Johnson,* 129 Md. 412, 99 A. 600.

The motion to dismiss the appeal is therefore overruled.

It follows from what we have said that the decree appealed from will be reversed.

*Decree reversed, with costs, and bill dismissed:*