WILLIAM E. NEEB ET AL. *v.* ATLANTIC MILL & LUMBER REALTY COMPANY.

[No. 15, January Term, 1939.]

298

*Decided March 8th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Louis J. Jira,* with whom was *John S. Mahle* on the brief, for the appellants.

*Frederick H. Hennighausen* and *George M. Berry,* for the Atlantic Mill & Lumber Realty Company, appellee.

SHEHAN, J., delivered the opinion of the Court.

The Atlantic Mill & Lumber Realty Co, Inc., and others, creditors of Edgar Keefer and Mary Catherine Keefer, his wife, filed their bill of complaint against Wm. E. Neeb and Anna P. Neeb, his wife, and Charles R. Neeb, and John S. Mahle, attorney named in a mortgage from Edgar Keefer and Mary Catherine Keefer to Charles R. Neeb, and Edgar Keefer and Mary Catherine Keefer, his wife.

The purpose of the bill of complaint was to have declared a lease from William E. Neeb and wife, and held through assignment by Edgar Keefer and wife, and a

mortgage for $2000 from Edgar Keefer and wife to
Charles R. Neeb, to be null and void, and also to declare
a certain mortgage from Edgar Keefer and wife to The
Atlantic Mill & Lumber Realty Co., Inc., to be a first lien
upon the property involved in this case, consisting of
three lots of ground located at Harford Park in Balti-
more County, and further to restrain John S. Mahle, at-
torney, from proceeding with a foreclosure of the mort-
gage from Keefer and wife to Charles R. Neeb, instituted
by him.

The facts alleged in the bill and sought to be established
by the testimony in support of the relief prayed are, in
substance, that William E. Neeb and his wife were the
owners in fee simple of the three lots of ground in Balti-
more County above mentioned, and known as Nos. 77, 78
and 79 in Block No. 5 on a plat of Harford Park, and located
on Wentworth Road. William and Charles Neeb are
brothers. They conducted as partners a plumbing busi-
ness and operated a corporation known as The Windsor
Construction Company, which engaged in improving and
selling real property. At the time of the transaction in
question Edgar Keefer was employed by William and
Charles Neeb, or this corporation, in the capacity of sales-
man for houses on a commission basis. The evidence
shows that he was not a partner, and did not share in
profits, and was not engaged in joint ventures with them.

In June, 1937, Keefer's employment as a salesman
terminated because of business conditions. He was then
desirous of establishing a business of his own, for the
purchase of land, building of houses, and sale of such
property. He approached Charles R. Neeb, with whom
he seemed to be in closer relations than with William E.
Neeb, for the purpose of purchasing the lots above men-
tioned, planning to improve them and then to sell at a
profit. Charles carried the proposition as made by
Keefer to his brother. William offered to sell the lots
in fee simple for $700. Keefer, it seemed, had had busi-
ness reverses and did not have the money with which to
purchase the lots. After some negotiations it was agreed

that William would lease the property to him for ninety-nine years, reserving an annual rent of $78. The lease originally was made to Clayton W. Bordley, a "straw man" and by him assigned to Keefer; it was dated June 24th, 1937, and was properly recorded in Baltimore County. The capitalization of the rent at six per cent would be $1300, and the difference between the $700 above mentioned and this capitalization was $600. This $600 was paid by William E. Neeb to Keefer and in turn Keefer paid $500 of it to Charles R. Neeb and the remaining $100 he paid for expenses of the transaction and other incidentals. The $500 payment is the subject of some controversy and difference of understanding between the parties as to its purpose. Charles R. Neeb, who had loaned to Keefer and wife $2000 on a mortgage, testified that Keefer had paid him the $500 as a bonus for making this loan. Keefer testified that $500 was paid to Neeb for making the loan, for extending him some credit with respect to plumbing for the house to be built, and for other services and advice rendered by Charles R. Neeb or to be rendered by him. This $600 was not deducted or paid out of the $2000 loan, but arose out of the transaction relating to the lease. Charles R. Neeb, the mortgagee, paid by check to Edgar Keefer and his wife the entire amount of the mortgage, which covered the three lots above mentioned. The mortgagee retained no part of the mortgage loan. When the $2000 was paid to Keefer and wife they immediately endorsed the check and turned it over to John S. Mahle, trustee, under agreement for its distribution, as the construction of the proposed improvements on the property progressed. This agreement between Keefer and wife and John S. Mahle, trustee, will be hereafter further considered.

Charles R. Neeb was not a party thereto. All of these papers, namely, the lease, the mortgage, and the agreement, were executed on June 24th, 1937. Keefer had purchased, on the morning of June 24th, 1937, from the appellants, the lumber in question, and this contract was reduced to writing. Charles R. Neeb was not a party to

it. In pursuance of the agreement, the lumber company supplied lumber and materials to Keefer, and later on became apprehensive of the ability of Keefer to pay for the same and requested of him a mortgage upon the property to secure the indebtedness, and in November, 1937, Keefer and wife executed a mortgage to the lumber company for $985 upon said leasehold property, and the mortgage was promptly recorded, as has been the mortgage for $2000 from Keefer to Charles R. Neeb.

In January, 1938, the mortgage being in default, John S. Mahle, the attorney named therein, began foreclosure proceedings and advertised the property for sale, whereupon the bill of complaint was filed for the purposes above recited. Answers were filed by the defendants, testimony was taken in open court and a decree was passed declaring both the lease from William R. Neeb and wife and held by Edgar Keefer and wife, and the mortgage from Keefer and wife to Charles R. Neeb, to be null and void, and declaring the mortgage from Keefer and wife to the lumber company to be a first lien upon the property, and also granting the other relief prayed. From this decree the appeal here is taken.

The questions presented for consideration are whether the mortgage, supplemented by the agreement as to the distribution of its proceeds, was for a future advance, and void under section 2 of article 66 of the Code; and, second, was the lease and the mortgage made for the purposes of hindering, delaying, and defrauding the creditors of Edgar Keefer, in violation of sections 4, 6, and 7 of article 39B of the Code, and, therefore, void.

The appellees contend that the arrangement whereby the proceeds of the mortgage loan of $2000 was paid by check to Keefer and wife and by them endorsed to John S. Mahle, as trustee, who, by agreement with Keefer, undertook to pay the same to Keefer in installments to be measured in amount by the work on the house, as it was from time to time completed, constitutes an arrangement for future advances within the above provisions of the Code of Public General Laws, and, therefore, void.

The contract in writing between Mahle and Keefer to effectuate this purpose in substance recites that Keefer and wife borrowed from Charles R. Neeb the sum of $2000 upon the representation and promises that the said sum will be employed and used exclusively in improving the lots of ground referred to, and provides that, in order to carry out this agreement, this sum of $2000 be deposited with Mahle as trustee, who shall deposit the same in such financial institution as he may deem proper, and that the premises shall be improved before September 15th, 1937, in accordance with certain plans and specifications lodged with the trustee, who is authorized to pay said deposit to the owner in six installments, which are defined with respect to the completion of certain parts of the building, with the right in the said John S. Mahle to foreclose the mortgage in case of default. This court has decided that such a mortgage and agreement does not, under article 66, section 2, constitute an agreement for future advances. *New Baltimore Loan & Savings Assn. v. Tracey*, 142 Md. 211, 120 A. 441; *Edelhoff v. Horner-Miller Mfg. Co.*, 86 Md. 595, 39 A. 314; and *Western National Bank v. Jenkins*, 131 Md. 239, 101 A. 667, where the facts in substance and effect are almost identical with the facts in this case.

In the case of *New Baltimore Loan & Savings Assn. v. Tracey, supra*, the following statement in the *Edelhoff* case was quoted with approval [142 Md. 211, 120 A. 444] : "The consideration set forth in the mortgage is the sum of $25,000, due from the mortgagor to the mortgagees. After the execution of the instrument that sum was in the hands of Shethar and Sanford, and the corporation could draw on it at its own pleasure. There is no evidence that the mortgage was executed for the purpose of securing other sums to be thereafter advanced. The sum to be secured having been particularly mentioned, the mortgage cannot be within the inhibitions of section 2 of art. 66 of the Code." In *Groh v. Cohen*, 158 Md. 638, 149 A. 459, Judge Urner distinguished the *Tracey* case and the *Jenkins* case, *supra*, in which the mortgages were

upheld, by saying, in language later quoted in *White Eagle Polish American Building & Loan Assn. v. Canton Lumber Co.*, 168 Md. 199, 210, 178 A. 214: "The amounts of the mortgage loan were paid to the mortgagors, but contemporaneous provisions were made for the future application of the funds, for the mortgagees' protection, in the improvement of the mortgaged property." This is what was done in the instant case, therefore there can be no doubt that this case falls clearly within the rules laid down in the above cases and the statute relating to future advances cannot be invoked here.

The facts above recited are further relied upon by the appellees to show that a scheme was devised by the appellants and Edgar Keefer to hinder, delay and defraud the creditors of Keefer and especially the appellees and in violation of the provisions of the statute 13th Elizabeth Chapter 5 as incorporated in our Code of Public General Laws, article 39B, sections 6 and 7, as follows:

"6 *(Conveyance by a Person about to Incur Debts.)* Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

Section 7 provides:

"*(Conveyance Made with Intent to Defraud.)* Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed by law, to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors."

Through the force and effect of these provisions the complainants contend that the lease from William E. Neeb and wife held by Edgar Keefer, by assignment, and also the mortgage of Keefer and wife to Charles R. Neeb, should be declared null and void, as a part of a fraudulent scheme to hinder and delay the appellee, and that the mortgage from Keefer and wife to the Atlantic Mill &

Lumber Realty Company, Inc., be declared a first lien on the three lots in question. Whether the evidence taken as a whole justifies this contention is the problem now to be considered.

William E. Neeb owned these lots and desired to sell them and had been offering them for sale. Keefer with his considerable experience in building and sale of houses and land had been out of employment for a time. He was anxious to get a start in buying land, building houses and the sale of such property for a profit, but had little money and was doubtless willing to enter into an arrangement with the brothers Neeb, at considerable sacrifice to himself, in order to get this start in business. It cannot be said that there is anything unusual about that, since Keefer did not have the money with which to make the purchase, and a plan was effectuated whereby William executed the lease to Keefer and wife. On the same day as the above lease and mortgage were consummated, Keefer entered into a contract in writing with the lumber company. This contract was signed by Keefer. It was not made in the presence of Charles Neeb nor was it signed by him, nor is it shown that he knew anything about the terms and conditions of the agreement. The negotiations were entirely between the representative of the lumber company and Keefer, and this statement is fortified by the allegation in the bill of complaint that "in reliance upon the representation of the defendant, Keefer, your complainant sold and delivered to the defendant, Keefer, lumber and building material to the total value of $985.02 for the erection of the dwelling house on said lots." The position of Charles Neeb in the matter is further strengthened by Keefer and wife giving a mortgage on the premises for the contract price of the materials purchased to the lumber company when it became apprehensive that there was uncertainty as to Keefer's paying the account. Neither of the Neebs joined in this mortgage, or acknowledged the debt as theirs, or gave any assurances as to its payment. The evidential facts in writing, together with the oral testimony of William and Charles

Neeb, supported by Keefer, show that the loan of $2000 was actually made by check payable to Keefer and wife and that no part of it ever was paid or repaid to the mortgagee, but all of it was paid by check of Mr. Mahle to Edgar Keefer, who testified that the money was applied toward the building of the house in question.

There is no evidence that Charles Neeb in any way participated in the alleged fraudulent transaction, nor is it clear that Edgar Keefer, however ill advised or incomplete his plans may have been, did actually promote a scheme with fraudulent intent to hinder and delay the lumber company. The payment of $500 to Charles Neeb and the effect upon this transaction is not too clear, but there is no evidence to show that this was a joint scheme or plan of the Neebs and of Edgar Keefer, or that they were partners in the transaction and thus liable. The entire matter is devoid of that secrecy which usually characterizes transactions tainted with fraud, because the mortgage and lease were promptly recorded, which gave constructive notice to all and actually notice to any one who might take the trouble to examine the records.

The contention that the statute applies to Charles Neeb or his brother William is not convincing, because the debt in question was not incurred by either of them, and by expressed terms, the statute relates to those who incur debts and not to those who become creditors in good faith. The transactions between Charles and William Neeb and Keefer are separate and distinct. William owned this real property and was desirous of selling it and did dispose of it to Keefer. Keefer desired to improve the property and borrowed the money from Charles with which to pay for the erection of the building. These are not transactions that would seem to hinder and delay creditors. His purchase of the property and borrowing the money with which to build the house cannot be said to render him insolvent. His assets were relatively augmented to the same extent as he increased his liability. His plans had in them nothing illegal, unless carried for-

306

ward in a fraudulent manner, there is no taint of fraud, and, even were it so, this cannot be attributed to William and Charles Neeb under all the facts, and, though the plans may have been ill conceived, this does not constitute fraud as to Keefer and certainly not as to either of the Neebs.

This court has said, referring to the above sections of Code, that "under these sections of the Code, and in accordance with the decisions of this court, it is necessary for subsequent creditors to allege as a fact that the conveyance of which they complain was made with the intention and design to defraud such creditors, and this fraudulent purpose will not be presumed, but must be proved, with the burden resting upon the one who charges the fraud." *Oakford Realty Company v. Boarman*, 156 Md. 65, at page 71, 143 A. 644, at page 647; *Turner v. Hudson Cement & Supply Co.*, 133 Md. 134, at page 145, 104 A. 455. We cannot hold, under the allegations of the bill, and from the entire evidence in the case, that these requirements and burdens have been fulfilled, or discharged. The decree of the court must, therefore, be reversed, costs to be paid by the appellees.

*Decree reversed, with costs to the appellants.*