**LOYOLA FEDERAL SAVINGS AND LOAN ASSOCIATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. No. 70-773-H.

United States District Court,
D. Maryland.

March 20, 1975.

**1376**

Theodore W. Hirsh, Jacques T. Schlenger, Harry D. Shapiro and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Edward J. Snyder and Jerome Fink, Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

Loyola Federal Savings and Loan Association (Loyola Federal) is here seeking to recover income taxes and interest previously paid the District Director of Internal Revenue. Specifically at issue in this case is whether this taxpayer was entitled to make certain deductions in the taxable years 1963 and 1964 as bad debt reserves.[1]

As a domestic building and loan association, Loyola Federal was entitled to avail itself of the provisions of § 593 of the Internal Revenue Code, 26 U.S.C. § 593.[2] In computing its income taxes for the years 1963 and 1964, Loyola Federal included as deductions certain reserves for bad debts and pursuant to § 593(b)(3)(A) used as one of the factors in the computation of each annual addition to such reserves an amount equal to 3% of what it determined to be its outstanding "qualifying real property loans".

A deficiency was thereafter assessed by the Internal Revenue Service for both 1963 and 1964. The District Director claimed that Loyola Federal had overstated its bad debt reserve for each year by including as qualifying real property loans certain amounts which the District Director claimed did not constitute "loans" under the applicable law. In its audit of the plaintiff's returns, the Internal Revenue Service eliminated from the eligible loan base used by the taxpayer to compute its bad debt reserve for each year that portion of its construction mortgage loans outstanding which was reflected in accounts designated "Funds Held by Trustees under Deeds of Trust", as of December 31,

1. The complaint also sought a refund for the 1965 taxable year and raised other questions as well. However, it has been agreed that the only issue remaining in the case involves the correctness of the deductions claimed by plaintiff as bad debt reserves for 1963 and 1964.

2. References to the Code are to the Internal Revenue Code of 1954, as amended and as applicable to the particular years in question.

1963 and December 31, 1964. Loyola paid the deficiencies together with interest for each year and duly filed claims for refund with the District Director at Baltimore, Maryland. Thereafter, Loyola Federal timely filed suit in this Court to recover the full amount paid plus interest. This Court has jurisdiction under 28 U.S.C. § 1346(a)(1), and venue lies in this District pursuant to 28 U.S.C. § 1402(a).

### The Facts [3]

During the years in question, Loyola Federal was a federally chartered savings and loan institution, with its principal offices located in Baltimore, Maryland. Like other lending institutions, Loyola Federal regularly made loans secured by interests in real property. Indeed, as required by law if Loyola Federal was to be taxed as a building and loan association under the Internal Revenue Code, substantially all of its loans were in 1963 and 1964 and other taxable years secured by interests in real property.

A borrower seeking from Loyola Federal a construction loan secured by real property would first file an application on a prescribed form. One of the institution's inspectors would then examine the real property in question and submit a report to Loyola Federal. Once the loan had been approved, the borrower was advised that at settlement the entire proceeds of the construction loan would be placed with trustees under a trust agreement which would provide, *inter alia,* that disbursements would be made at such times and in such amounts as set forth in a schedule attached to the notification of approval. At settlement, a note would be executed by the borrower, together with a deed of trust securing the entire loan.[4] A check for the full amount of the construction loan would thereupon be issued by Loyola Federal to the borrower. Another and separate trust agreement would then be executed by the borrower, such trust being created to hold the loan proceeds and disburse them from time to time in accordance with the agreed schedule for payment of such proceeds during the period of time that construction was under way. The trustees under such irrevocable trust agreement were officers of Loyola Federal.

Upon receipt at settlement of a check representing the proceeds of the loan, the borrower would immediately endorse and deliver such check to the individual trustees, who would hold the proceeds under the aforementioned trust agreement. The trustees would then deposit such check in an account in their names at Loyola Federal. For accounting purposes, all such deposits were carried on Loyola Federal's books in a general ledger liability account entitled "Funds Held for Trustees under Deed of Trust Agreements". The officers of the institution named in these trust agreements received no compensation out of the trust funds for services they rendered as trustees but were paid by Loyola Federal their regular salaries which covered their ordinary duties and any additional services rendered to the trusts. During the tax years in question, all of the funds held by the trustees under agreements such as these were deposited with Loyola Federal and were included in and commingled with other deposits held by the institution. No interest was paid by Loyola Federal on any of these accounts opened by these trustees.

The funds held by the trustees were disbursed to a borrower in accordance with a schedule which linked payments to different stages of the construction work under way. The trust agreement required that payments for the improvements be in strict compliance with the plans and specifications. When a par-

---

3. This case has been submitted to the Court on stipulated facts and exhibits.

4. The deed of trust was then recorded in the appropriate land record office, thus perfecting Loyola Federal's lien on the real property securing the loan.

ticular stage of completion had been reached, the borrower would present a request for payment of a particular installment. Upon receipt of the certificate of an inspector that the actual stage of completion had in fact been reached, the trustees would sign an authorization form which empowered Loyola Federal to disburse trust funds in a particular amount to the borrower. No interest was charged by Loyola Federal on any installment until actual disbursement had been made to the borrower, at which time interest at a specific rate would commence only on amounts advanced. The inspectors employed for the purpose of submitting certificates were either employees of Loyola Federal or independent construction engineers or architects hired by it. When all of the funds in a particular trust had been advanced to the borrower, the account was closed. At that point, the required monthly principal and interest payments in a particular dollar amount would become payable for the number of months specified. Most construction loans were fully disbursed within a 12-month period after the settlement dates, with a few being disbursed within a period of 13 to 18 months.

In the event of default at any time while the trustees were in possession of undisbursed funds, the trustees were empowered in their discretion to pay the entire fund over to Loyola Federal to be applied against indebtedness under the note or to use the funds to complete construction under way. On two occasions before 1960, defaults had in fact occurred on construction loans made by Loyola Federal. In both instances, Loyola Federal foreclosed on the secured real property, and the undisbursed funds held by the trustees were paid over to it

and applied as offsets against the borrowers' total indebtedness under the notes.

During 1963, the plaintiff was a party to 440 construction loans aggregating in excess of 27 million dollars. In 1964, these figures were 567 loans amounting to over 38 million dollars.

In its 1963 federal income tax return, Loyola Federal computed its bad debt reserve by using a figure of $215,101,-831.79 as qualifying real property loans under § 593(b)(3).[5] Included in that amount was $14,753,368, which at the end of the year was held in the trust accounts carried on the taxpayer's books as "Funds Held by Trustees under Deeds of Trust".[6] In 1964, the similar figure used as qualifying real property loans was $282,797,066.98, which included $24,256,739.58 held in the various trust accounts.[7] In both 1963 and 1964, the Internal Revenue Service reduced the amount of the bad debt reserves, claiming that those portions of the taxpayer's construction loans which were held in the various trust accounts at the end of the year and not disbursed were not properly includible as qualifying real property loans. Thus, in computing the bad debt reserve for 1963, the Internal Revenue Service subtracted $14,753,368, which was the amount carried by Loyola Federal on its books as "Funds Held by Trustees under Deeds of Trust". In 1964, the amount subtracted was $24,-256,739.58.[8]

### The Law

§ 166(a)(1) of the Internal Revenue Code of 1954 allows as a deduction any debt which becomes worthless within the taxable year. As an alternative method of computation, § 166(c) allows a deduction for a reasonable addition to a re-

---

5. Loyola Federal maintains its books and records on a calendar year basis, uses the accrual method of accounting and files its corporate income tax returns accordingly.

6. The deduction taken by Loyola Federal on its 1963 income tax return as an addition to its bad debt reserve under § 593(b)(3) was $1,209,737.32.

7. The deduction taken by Loyola Federal on its 1964 income tax return as an addition to its bad debt reserve under § 593(b)(3) was $1,775,386.40.

8. The final reductions made in the reserves themselves by the Internal Revenue Service were $123,714.07 for 1963 and $285,100.23 for 1964.

serve for bad debts. Using this alternative, a taxpayer may include in such reserve for bad debts that sum necessary to bring the balance in the reserve to an amount which can be reasonably expected to cover anticipated losses with respect to debts outstanding at the end of the year. *See* Dixie Furniture Co. v. Commissioner, 390 F.2d 139 (8th Cir. 1968). The reserve method of deducting bad debts thus permits the taxpayer to take the deduction in the year in which the transaction occurs rather than in the year in which a debt comes worthless.

§ 593 of the Code contains provisions relating to reserves for losses on loans of certain banking institutions and domestic building and loan associations like Loyola Federal. For the years in question, § 593(b) provided in pertinent part as follows:

> (b) Addition to reserves for bad debts—
>
> (1) In general—For purposes of section 166(c), the reasonable addition for the taxable year to the reserve for bad debts of any taxpayer described in subsection (a) shall be an amount equal to the sum of—
>
>> (A) the amount determined under section 166(c) to be a reasonable addition to the reserve for losses on nonqualifying loans, plus
>>
>> (B) the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans. * * *

§ 593(b) further permits a taxpayer to use several different methods for computing such reserve. Loyola Federal computed its deduction by using paragraph (3) of § 593(b), the so-called "percentage of real property loans method". Under paragraph (3), Loyola Federal was allowed to compute the addition to its reserve for bad debts so that the account equalled 3% of "qualifying real property loans" outstanding as of the close of the taxable year.

Various terms are defined in § 593(e). In particular, § 593(e)(1) provides as follows:

> (1) Qualifying real property loans—The term "qualifying real property loan" means any loan secured by an interest in improved real property or secured by an interest in real property which is to be improved out of the proceeds of the loan, * * *

There is a further definition of the term "loan" contained in § 593(e)(3), which provides as follows:

> The term "loan" means debt, as the term "debt" is used in section 166.

§ 166 itself contains no definition of the term "debt". However, § 1.166–1(c) of the Regulations is as follows:

> (c) *Bona fide debt required.* Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * *

Regulations promulgated under § 593 further limit the meaning of the term "qualifying real property loan".[9] § 1.-593–11(d)(1) of the Regulations provides in pertinent part as follows:

> * * * the amount of any qualifying real property loan or nonqualifying loan, for purposes of section 593, is the adjusted basis of such loan as determined under § 1.1011–1. However, the adjusted basis, determined under § 1.1011–1, of any "loan in process" does not include the unadvanced portion of such loan.

### Discussion

#### (a) General Principles

What must be determined in this case is whether the funds held by trustees at the close of these taxable years under the construction loan trusts then in effect constituted a "loan * * secured by an interest in real property which is

---

9. Regulations under § 593 are set forth in 26 C.F.R. § 1.593–1 to § 1.593–11.

to be improved out of the proceeds of the loan * *", under § 593(e)(1). The position taken by Loyola Federal essentially is that at settlement the entire amount of a construction loan was a qualifying real property loan under § 593, whether paid over to the borrower or not during the taxable year. On the other hand, the government's basic position is that any amount subject to a construction loan trust was not a true loan or a bona fide debt while held by the trustees and could not be considered under § 593 to be a part of a qualifying real property loan until disbursed to the borrower.

■ Analysis of the facts here in the light of the applicable statutory provisions leads to the firm conclusion that Loyola Federal improperly included in its bad debt reserves for both 1963 and 1964 all of those amounts held in trustee accounts and not disbursed to borrowers during the years in question. This Court concludes that no loans occurred for the purposes of § 593 until funds held by trustees were in the hands of or otherwise under the control of the borrowers. Such did not occur while these funds were held in trusts subject to the provisions of the various trust agreements. During such periods of time, the funds were deposited with the taxpayer, subject to the order of officers of the taxpayer acting as trustees.

At no time during each of the taxable years in question did the borrowers have any use of these funds, nor were the borrowers required to pay interest on them to Loyola Federal. Although the funds were deposited with it until disbursed, Loyola Federal paid no interest to the borrowers. Even more significantly, there was no risk of loss whatsoever insofar as Loyola Federal, the lender, was concerned, until the sums were paid out to the borrowers. In case of default, the trustees were authorized to immediately pay the entire amounts over to Loyola Federal to be applied against the indebtedness otherwise due. Indeed, in two previous cases of default on the part of borrowers, this procedure was followed, and the trustees paid over in full to Loyola Federal the sums held in the trust agreements and not as yet disbursed to the borrowers. The fact that the trustees may alternatively in the event of default have used the funds to complete the construction is of little significance. Presumably funds held in trust would be used in this manner only if completion of the construction already under way would result in less of a loss to Loyola Federal than payment directly to it for immediate offset against the indebtedness. Thus, Loyola Federal would face even less risk than otherwise if in a particular case it was financially prudent for the trustees to use the funds to complete the construction. Although serving in a fiduciary capacity under the various trust agreements, the trustees were officers of Loyola Federal and received no compensation beyond their normal salaries for any services performed as trustees. Quite obviously, they would be expected in the event of a default before all the funds had been disbursed to protect the financial interests of their employer, Loyola Federal.[10]

■ The provisions of § 593 and § 166 of the Internal Revenue Code must be interpreted together in the light of their ultimate purpose.[11] The deduction allowed under § 166 is for "bad debts", and the reserve under § 593 is for "losses" on qualifying real property loans. As the amounts held in trust here could not possibly become bad debts or result in losses during the taxable year in question, they would not constitute loans made in that year within the meaning of § 593. This does not mean that if a tax-

---

10. As this Court has construed the applicable statutory provisions, the result would be the same even if independent trustees were used. Nevertheless, the government's case is somewhat stronger where employees of the lender act as trustees.

11. Indeed, there are numerous cross references in § 593 to § 166. See Subsections (b)(1); (b)(4); (c)(3)(A); (c)(4); (d); (d)(1); (d)(2) and (e)(3).

payer chooses the reserve method for computing its deduction, it must show that losses actually occurred in a particular year. It does mean, however, that sums like these which could not be considered under the law to have been loaned during the taxable year cannot be included as a part of the reserve. The term "loan" in § 593 means "debt", and only bona fide debts qualify under § 593 as well as under § 166. Where during the taxable year in question there is no risk to the lender, no interest paid by the borrower and no right on the part of the borrower to make any use of or receive any benefit from the funds, there has been no bona fide debt created in such year as to such funds.

The applicable Regulations recognize that funds held by trustees but not disbursed during the taxable year in a transaction of this sort would not constitute part of a loan under § 593. § 1.-593–11(d)(1) provides that the adjusted basis of any "loan in process" does not include the unadvanced portion of such loan. The Commissioner's construction of the statutory provisions in question is a reasonable one and should not be overruled under the circumstances here. *See* Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957).

Loyola Federal argues that the type of transaction involved in this case is not a "loan in process" because a completed loan has been made. Such a contention begs the question before the Court. A fair reading of the Regulation in the light of the statutory provisions themselves suggests that the Commissioner's intention was to exclude as a qualifying real property loan that portion of a construction loan which had not been advanced to the borrower during the taxable year in question.

It is the plaintiff's position that the statute and Regulations require the Court, in determining whether the sums involved here are "loans" under § 593, to look at the transaction from the point of view of the lender which has "advanced" all of these amounts at the time of settlement. This Court would disagree. The ultimate question is whether a bona fide debt has been created, and such a question can be properly answered only if the transaction is viewed with both the lender's and the borrower's interests in mind. Looking at the transaction with the lender as the point of reference, it appears that as to undisbursed funds no interest was received by it and no risk was incurred by it during the taxable years in question. Looking at the transaction with the borrower as the point of reference, it appears that such borrower had no use of and received no benefit from these funds and paid no interest on them during the taxable years in question. Such analysis in the aggregate requires the conclusion that no bona fide debt was created and that the amounts involved were not qualifying real property loans within the meaning of § 593(e)(1).

It is also argued that the borrower at all times after the settlement had an obligation to repay the entire amount of the loan and thus a bona fide debt existed as to both the advanced and the unadvanced portions. Such a contention overlooks the true nature of a transaction of this sort. Like funds placed in escrow, the unadvanced portions of the construction loan were until paid out available as an immediate offset against the total amount of the indebtedness. In the event of a default, both the borrower and the lender would benefit from the trust arrangement, the borrower because his obligation to repay would be reduced by the amount held back and the lender because his risk of loss would be reduced by that very same amount. It can hardly be said under such circumstances that the borrower would have to be concerned at any time with the obligation to repay the unadvanced portion of the loan, any more than it can be said that the lender at any time faced any risk of loss as to such portion.

### (b) Maryland Law

The argument pressed most vigorously by Loyola Federal is based on provisions of Maryland law. It is contended that Maryland law recognizes that at the time of settlement in a transaction such as those here involved, all the moneys advanced by Loyola Federal constituted a present loan, whether or not actually disbursed to the borrower. Western National Bank v. Jenkins, 131 Md. 239, 101 A. 667 (1917); Neeb v. Atlantic Mill and Lumber Realty Co., 176 Md. 297, 5 A.2d 283 (1939); Goertz v. Backman, 195 Md. 450, 74 A.2d 3 (1950); Toney Schloss Properties Corp. v. Union Federal Savings and Loan Association, 233 Md. 224, 196 A.2d 458 (1964).

 There are two answers to this argument. First, state law is not controlling where the question before the Court involves the meaning of terms included in federal tax statutes and defined in the statutes themselves. As the Fourth Circuit observed in Road Materials, Inc. v. Commissioner, 407 F.2d 1121 (4th Cir. 1969), at page 1124, fn. 3:

> It does not follow, however, that an advancement qualifying as a debt under state law must be treated as a debt under the Internal Revenue Code. Cf., Industrial Addition Ass'n v. Commissioner of Internal Revenue, 149 F. 2d 294, 295 (6th Cir. 1945). In an analogous situation, advances were held to be capital, although the Interstate Commerce Commission had authorized their entry on a railroad's books as debt. See Jewell Ridge Coal Corp. v. Commissioner of Internal Revenue, 318 F.2d 695, 697 (4th Cir. 1963).

Secondly, the issue presented in the Maryland cases cited by the taxpayer is quite different from the one involved here. In those cases, the question was whether the lien of the lender's mortgage attached at settlement to construction loan funds held under trust accounts like those here or whether an invalid mortgage to secure future loans or advances had been created. In holding that a mortgage of this sort was not one to secure future loans or advances, the Court of Appeals of Maryland in the cases cited was deciding solely questions relating to the priority of liens. It found in those cases that under state mortgage law a present loan secured by a mortgage had been created and not a mortgage to secure a future loan. The contest in each case was between the lender and a third party claimant and the decision in each instance was that the lender's mortgage had priority, even though the funds had not then been disbursed to the borrower. Here the totally different question is whether such a transaction creates for tax purposes a bona fide indebtedness between the lender and the borrower before the borrower has use of the funds and starts paying interest and before the lender incurs any risk. That issue was not raised nor decided by the Court of Appeals in any of the Maryland cases cited, all of which dealt primarily with questions of state mortgage law.

### (c) Legislative History

Loyola Federal also argues that the legislative history of § 593 of the Code supports its position in this case. Substantial revisions of § 593 were made by Public Law 87–834 enacted on October 16, 1962 and made effective for taxable years beginning after December 31, 1962.

As originally considered by the House Committee on Ways and Means, § 593(e)(1) of H.R. 10650 provided that the term "qualifying real property loans" meant "any loan of the taxpayer secured by an interest in improved real property, * *." Such definition was later expanded to provide (as it does now) that the term "qualifying real property loan" means "any loan secured by an interest in improved real property or secured by an interest in real property which is to be improved out of the proceeds of the loan, * * *." See the remarks of Chairman Wilbur Mills on the floor of the House of Representatives on March 29, 1962,

the day the House passed the Bill. 108 Cong.Rec. 5429 (1962). Plaintiff argues that such change, as amplified by the House and Senate Reports, indicates that Congress intended that amounts such as those at issue here should constitute qualifying real property loans within the meaning of the law.

There is no support for this contention in either the House or Senate Reports. See H.R.Rep., No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 Cum. Bull. 405; S.Rep.No.1881, 87th Cong., 2d Sess. (1962), 1962–3 Cum.Bull. 707. The amendment to the original bill did no more than make it clear that construction loans as well as other types of real property loans were within the meaning of the term "qualifying real property loans". Without the amendment, it could not be determined with any degree of certainty whether a construction loan was included within § 593(e)(1) or not, since improvements to the real property are made at the same time that the proceeds of such a loan are being advanced to the borrower. The amendments did no more than carry out the original intent of the Ways and Means Committee to include construction loans within the definition of the term. *See* 108 Cong.Rec. 5429 (1962).

There is nothing in the legislative history to indicate that Congress made any amendments in the law with a transaction such as the one involved here specifically in mind. There are obviously many different ways that a lending institution can minimize its risk during the period of time when construction is under way and the proceeds of the loan have not been fully advanced. The trust fund method employed by Loyola Federal does not appear to have been considered by Congress, which was concerned with the question whether construction loans in general would be included within the statutory definition and not with the circumstances under which such a loan would be considered to have been made.

*(d) The Federal Cases*

In its pre-trial briefs and oral argument, the plaintiff relied heavily on Akron National Bank and Trust Co. v. United States, 32 A.F.T.R.2d 73–6091 (N.D.Ohio 1973). However, since argument in this case, the United States Court of Appeals for the Sixth Circuit has handed down an opinion reversing the District Court's decision in that case. Akron National Bank and Trust Company v. United States, 510 F.2d 1157 (6th Cir. 1975).

The *Akron National Bank* case arose under § 166(c) and involved somewhat different facts from those presented here. There a commercial bank claimed as a bad debt reserve deduction under § 166(c) certain proceeds of construction mortgage loans which it withheld in a special account to be disbursed to the borrowers at different stages of construction. The Sixth Circuit ruled that the bank's election to report its bad debt deduction by the reserve method under § 166(c) subjected it to the reasonable discretion of the Commissioner of Internal Revenue. Rejecting the District Court's analysis of the transaction, the Sixth Circuit found that the Commissioner had acted reasonably in determining within his discretion that construction mortgage loan funds which were not disbursed during the taxable year should not have been included as outstanding loans for the purpose of computing the bank's addition to its bad debt reserve for that year.

The pertinence of the *Akron National Bank* decision here is the significance which the Sixth Circuit in its opinion attached to the borrower's control of the funds in question. At page 1159 of 510 F.2d the Court said this:

> Thus, the Borrower did not have complete control of funds which the Bank had agreed to lend the Borrower upon the signing of the mortgage. The funds remained in the Bank and did not constitute property rights of contractors or others until actually disbursed.

The appellate court specifically disagreed with the District Court's conclusion that the construction loan agreements were "indivisible" and held that any undisbursed funds could not be included as a part of a bad debt deduction until the year in which they were disbursed. The Court then observed that a different case might be presented "if the undisbursed funds were completely within the borrowers' control * * *." (p. 1162). Similarly, a different case would be presented here if the borrowers had complete control of the funds held in the trusts during the taxable years involved.

Another case which arose under § 166(c) is also pertinent here. In First American National Bank of Nashville v. United States, 327 F.Supp. 675 (M.D. Tenn.1971),[12] aff'd per curiam, 467 F.2d 1098 (6th Cir. 1972),[13] the bank had included in its outstanding loan base for computing its bad debt deduction under § 166(c) certain portions of its loans which were held back from borrowers as reserves against defaults. In ruling in favor of the government, the lower court looked at the substance of the transaction and held that the amount of loans outstanding was only the amount actually advanced by the bank and which it had at risk in the hands of the borrower. The Court said (at 681–82 of 327 F.Supp.):

> * * * To hold otherwise would open the door to as many schemes as the mind of man could imagine. An analogous circumstance is that of a construction loan. The bank issues a letter of commitment (usually contingent). Later a note is executed but no money advanced. Still later, as the construction progresses, the funds are advanced in proportion to the percentage of construction. Keeping in mind that we are not here concerned with the law of contracts or obligation to

make loans, at what stage is there an unconditional and outstanding loan and in what amount?

Basically as an accounting and business principle, there can be no bad debt if there is no risk of loss.

Similarly, it is significant here that Loyola Federal incurred no risk of loss as to these funds while they remained in trust. Because of this and the other factors previously discussed, the amounts in question did not constitute a "loan" or "loans" in these two taxable years within the meaning of § 593(b)(1)(B) and § 593(e)(1).

### Conclusion

For the reasons stated, this Court concludes that the District Director of Internal Revenue properly subtracted from the amounts claimed by Loyola Federal as bad debt reserves for 1963 and 1964 the sums contained in these trust accounts. Judgment is accordingly entered in favor of the defendant, with costs.

---

12. A companion case is Third National Bank in Nashville v. United States, 27 A.F.T.R.2d 71–818 (M.D.Tenn.1971), aff'd per curiam, 454 F.2d 689 (6th Cir. 1972), in which the same judge reached the same result for the same reasons.

13. The appeal was limited to other questions which are not involved here.