40 Md. App. 438 (1978)
392 A.2d 1121
PAUL R. HOFFMAN ET UX.
v.
KEY FEDERAL SAVINGS AND LOAN ASSOCIATION.
No. 60, September Term, 1978.
Court of Special Appeals of Maryland.
Decided October 13, 1978.
The cause was argued before DAVIDSON, WILNER and COUCH, JJ.
Leo Howard Lubow, with whom were Michael L. Schwartz and Freishtat & Schwartz on the brief, for appellants.
Franklin Goldstein, with whom were Melnicove, Kaufman & Weiner, P.A. on the brief, for appellee.
WILNER, J., delivered the opinion of the Court.
*439 Appellants, Paul and Judith Hoffman, for themselves and a class they seek to represent, appeal from an order of the Circuit Court for Baltimore County sustaining appellee's demurrer to Count I of their Amended Declaration, without leave to amend, and from the court's refusal to allow the action to proceed under Maryland Rule 209 as a class action.[1] The principal question is whether the court erred in concluding, from the facts alleged in Count I (and the exhibits incorporated in it), that a certain loan transaction between the parties was not usurious.
The loan transaction in question was in the nature of construction financing convertible into a "permanent" mortgage, in order to allow the Hoffmans to build a home on a lot they purchased in Howard County. Appellants used $53,000 of their own money, and desired to borrow $14,000 from appellee, Key Federal. Pursuant to a previous commitment letter, Key Federal agreed to make the loan, settlement of which occurred on January 29, 1976.
At that time, and in accordance with the terms of the commitment letter, Key Federal delivered to the Hoffmans its check for $14,000, the full proceeds of the loan. The Hoffmans immediately endorsed that check (and delivered as well one of their own for $53,000) to Robert L. Kolscher and George G. Wachter, trustees. The delivery of these funds was accompanied by the execution of a trust agreement governing, among other things, the future disbursement of the funds. The $14,000 loan was evidenced by a promissory note, secured by a deed of trust upon the Hoffmans' lot and improvements. The note required repayment in equal monthly installments of $105.75, principal and interest, commencing May 1, 1976, and continuing for the ensuing 25 years. Interest commenced running on the $14,000 from the date of closing, and, apparently, was separately billed for the period from January 29, 1976, through April 30, 1976  the construction *440 period. An annual interest rate "on the unpaid balance" was stated in the note to be 7 3/4%.
The critical agreement, in terms of the legal issue presented, is the trust agreement between the Hoffmans and the two trustees, both of whom are alleged to be "officers, agents and employees of Key Federal and were acting on behalf and under the control and direction of Key Federal." The agreement recited the loan from Key Federal, and stated that a "condition precedent" to the loan was that the Hoffmans erect and complete certain improvements within nine months from that date. It stated further that "for the purpose of guaranteeing the completion of said improvements", the Hoffmans had turned over to the trustees the proceeds of the mortgage loan, and that such proceeds were "to be deposited by said Co-Trustees, in their own names, with Key Federal Savings and Loan Association as a pending fund to secure the erection of the aforesaid improvements". These funds were to be advanced to the Hoffmans in six installments as certain specified levels of completion were achieved.
The agreement prohibited the commencement of any work until written authorization was received from Key Federal. However, once such authorization was received, work must commence within 30 days; otherwise, the agreement "may be voided by the Co-Trustees and all monies paid to Key Federal ... on account of their mortgage loan...."[2] In that event the Hoffmans released the trustees from "any suits, legal actions, etc.", and "by the signing of this agreement ... hereby expressly give their permission to the said Co-Trustees to follow the above stated course of action." In similar vein, the agreement provided that, if work on the improvements stopped for a period of 20 consecutive days, or was not completed within nine months, the trustees, "in their discretion, have the authority to use the balance of the aforesaid loan then in their hands towards the cost of *441 completing said improvements or to pay [Key Federal] on account of its aforesaid mortgage loan."
Finally, the agreement provided that "by the acceptance of this trust by the [trustees] and the agreement by them to perform the duties imposed upon them ... they do not assume any personal responsibility, and [the Hoffmans] do ... not hold them responsible and do ... expressly release them from such responsibility and no claim shall be made upon them for or on account of any matter or thing in excess of the sum of money paid into their hands or such balance thereof as may be remaining and undisposed of in accordance with the terms and agreements as hereinbefore set forth."
Pursuant to this agreement, the trustees deposited the entire sum (presumably the $67,000) in a noninterest bearing account at Key Federal, withdrawing and disbursing the same as construction proceeded. Although the Amended Declaration did not specifically allege this, the court, in lieu of granting leave to amend, considered the pleading as implicitly alleging that, while on deposit with Key Federal, these funds were not segregated in any way, but were instead intermingled with Key Federal's general funds, and were thus usable and used for the general purposes of the association.
The basis of the Hoffmans' complaint is that, between January 29, 1976 (the date of closing) and the time the last advancement was made pursuant to the trust agreement, the Hoffmans paid $800 in interest to Key Federal, this being interest on the full amount of the $14,000 loan for that period, notwithstanding that the loan proceeds were advanced in installments. Their claim is that they were required to pay interest on amounts that had not been advanced to them, and that did not, therefore, constitute an "unpaid balance" upon which interest could properly be charged. This $800, they assert, amounted to usury in that it constituted interest on amounts not actually lent to and within the exclusive control of the Hoffmans; and they sought as damages $2,400.[3] In *442 addition, as representatives of a class, on behalf of each other person in the class who obtained a residential construction loan from Key Federal under similar arrangements, they claimed the greater of $500 or treble the amount of "usurious" interest charged.
Appellants' theory of recovery emanates primarily from the principles announced by the Court of Appeals in Tri-County Fed.S. & L. v. Lyle, 280 Md. 69 (1977); and, in large part, the initial question is whether the transaction alleged here is but a variation upon a theme or something substantially different from that considered by the Court in that case.
Lyle also involved a residential construction loan, obtained in order to finance both the purchase of a lot and construction of a house on it. At closing, a check for $60,000 was issued to the Lyles, which they immediately endorsed back to the savings and loan association. The association then paid out $15,000 to the seller of the lot, that being the purchase price of the property, but retained the balance of $45,000, which became part of its general funds. No separate escrow account was maintained. The $45,000 was to be paid out by the association in nine installments as work progressed. Evidencing the transaction was a note for $60,000, bearing interest at the rate of 8% per annum, secured by a deed of trust.
Five months later, before any part of the $45,000 had been disbursed, the Lyles abandoned their plans and repaid the association $15,000 plus $573.29 accrued interest on the $60,000. During the interim, an additional $1,600 in interest had been paid. Thereafter, Mr. and Mrs. Lyle sued to recover three times the amount of interest paid on the $45,000. With respect to this undisbursed sum, the Court stated, at page 73:
"At no time was this under the Lyles' control, or under their partial control, as it might have been had it been held in escrow by others for their account, even though subject to restrictions. It was deposited in Tri-County's general account, and remained there from the day the Lyles signed the note until repayment was made."
*443 For that reason, said the Court, that sum was not part of any "unpaid balance" owed by the Lyles, and any interest charged on it was usurious. At page 76:
"Here the `unpaid balance' referred to by Art. 49, § 3 [the predecessor statute to Commercial Law article, § 12-103] was the $15,000.00 owed by the Lyles to Tri-County; the $45,000.00 was a balance beyond their control, to which they had no access until they commenced the construction of their house. So long as it remained in the sole control of Tri-County, and was not utilized by the Lyles, the imposition of the interest charged was usurious, because the $45,000.00 was not and could not be a part of the unpaid balance of the loan to the Lyles."
Seizing upon the Court's comment about the absence of an escrow account in Lyle, Key Federal attempts to distinguish that case, and thereby escape from the meaning the Hoffmans ascribe to it, by pointing to the trust agreement existing here. It relies on Toney Schloss v. Union Federal, 233 Md. 224 (1964), and the cases cited in it for the proposition that the full $14,000 became "presently loaned" to the Hoffmans, and therefore constituted the "unpaid balance", at time of settlement, when the proceeds of the loan were actually, though only momentarily, disbursed to them.
Toney Schloss involved a construction loan arrangement very similar to that used here. The mortgage loan proceeds were disbursed to the borrower at settlement, and, as part of the overall agreement with the lender, these proceeds were immediately deposited with trustees selected by the lender, to be further disbursed in stages as construction progressed. The case did not involve the question of usury, or whether interest could properly be charged prior to disbursement by the trustees. Rather, the sole question was whether such an arrangement constituted a mortgage to secure "future advances", and, as to any disbursement made by the trustees that they were not required to make under the loan agreement, whether the construction mortgage became subordinate to another mortgage given to a third party of *444 which the construction lender had actual notice.[4] It was in this context that the Court concluded (233 Md. at 233) that "the money loaned by the [construction mortgagee] to the mortgagor was money presently loaned and it did not constitute future advances". Consequently, said the Court, the construction mortgage "was a lien for the full amount of the consideration named therein from the time of its recordation...."
The argument of Key Federal has a certain facial appeal: if, under Toney Schloss (and a number of cases that preceded it), the full amount of the loan proceeds are considered to be "presently loaned" when disbursed at time of settlement, notwithstanding their immediate deposit under a trust agreement, surely they must also constitute the "unpaid balance" owed as of then. This argument overlooks, however, the very different considerations involved in the two types of situations.
The device of disbursing the entire loan proceeds at time of settlement, and then requiring the borrower to deposit them in trust pending further disbursement based upon the progress of construction, was developed and used primarily to avoid the effect of an 1872 statute making the priority of future advances date from the time of the advancement, rather than from the date of the mortgage, as against the rights of intervening creditors. See Comment to Former Article 21 (noted in footnote 4). The obvious policy embodied in that statute was to protect subsequent creditors by assuring that those claiming prior liens had, in fact, given value for those liens. Thus, a lien could not be claimed with *445 respect to money that had not been advanced. As against this policy, however, a construction lender had to be assured that the funds lent, or obligated to be lent, would, in fact, be used for the intended purpose, and that the security of his lien would not be jeopardized by collateral transactions occurring after he committed himself and during the progress of construction. To conclude, in that context, that the entire sum was "presently loaned" at time of settlement, when the lender actually committed the funds to the borrower under an arrangement that assured their ultimate actual disbursement to the project, was a reasonable and pragmatic resolution to what otherwise would have been a serious statutory impediment to efficient construction financing. As between the construction mortgagee, the mortgagor, and intervening creditors, no one was injured by such a result, and the statutory goals could be achieved.[5] Constructive notice of the full amount of the lien was given to the world when the mortgage was recorded; thus, prospective intervening creditors would know what lien was ahead of them, and the construction lender was assured of his first lien on the entire amount of his construction loan.
The considerations at issue with respect to the usury laws are quite different. These laws deal not with the co-relative rights of creditors, but with the relationship between lender and borrower. They deal with interest, which the law defines as compensation imposed by a lender "for the extension of credit for the use or forbearance of money...." (emphasis supplied), Commercial Law article, § 12-101 (e); and their purpose is to limit the amount of such compensation that may lawfully be exacted by lenders. The point addressed by Lyle is that, in order to charge interest in the first place, there must exist the "use or forbearance" of money. Thus, interest may not be charged for the "use" of money of which the borrower has had no use, or for the "forbearance" of money which the lender has not forbore. Because, in this context, we are dealing with a charge imposed by a lender solely by *446 reason of his ceding control over money to the borrower, the question of whether such a cession has in fact occurred becomes paramount. It is not, therefore, the obligation or agreement to relinquish the funds that is relevant, but the actual relinquishment.
This does not, of course, require an unconditional relinquishment; Lyle makes clear that some restrictions as to use or possession may be imposed. But when the totality of the restrictions, or the totality of the circumstances under which they are imposed, is so pervasive as to negate the reality of an actual relinquishment of use and control, so long as that condition pertains, there has not been the forbearance or transferrence of use required in order to assess interest. Thus, whereas for purposes of determining the priority of "future advances" the commitment of funds may have sufficed to make the amount committed "presently loaned", in dealing with the usury laws, it is the relinquishment, not the commitment, that governs.
It is in this light that we must test the circumstances of this case against the principles stated in Lyle. Given the overall nature of the transaction at issue here, and, in particular, the character of the trust agreement itself, we believe that the principles announced in Lyle are equally applicable to the situation here. Quoting from earlier cases, the Court made clear in Lyle that "the laws against usury ought to be strictly enforced", that "courts have not hesitated, in every case, to tear off, with unsparing hands, the mask under which it has been attempted to conceal the usury, and to declare the true nature of the transaction", that "no device or subterfuge of the lender will be permitted to shield him in taking more than the legal interest on a loan", and finally that "[i]n whatever part of the transaction usury may lurk, or in whatever form it may take, or under whatever guise the lender may attempt to evade the law, the court will seek to ascertain what the contract actually was between the parties and give the debtor relief." See 280 Md. at 74, 75.
Based upon the allegations in the Amended Declaration, the Hoffmans had no more control over or use of the $14,000 here, prior to disbursement by the trustees, than the Lyles *447 had over the $45,000 while it remained in the hands of Tri-County. Conversely, Key Federal gave up no significantly greater measure of control over or forbearance of the $14,000 prior to such disbursement, than did Tri-County. The Court's mention of an escrow account in Lyle was in the context of whether the funds were "under the Lyles' control, or under their partial control." That was the critical element. The use of a trust arrangement that contains the form but not the substance of the requisite control will not suffice; and here there was only the appearance  the form  of control in the Hoffmans. Coupling the facts (alleged in the Amended Declaration) that (1) the trustees were officers of Key Federal, not selected by the Hoffmans, (2) they had no discretion in terms of investing the corpus of the trust, but were required to maintain it in a noninterest bearing account at Key Federal, (3) once so deposited, the funds were not segregated, but were intermingled with the other general funds of the association, and remained available for general use by the Association, including re-lending or re-investing, and (4) the immunity of the trustees from any liability to the Hoffmans except to the extent of any balance remaining in their hands, it is clear that, prior to disbursement by the trustees, the Hoffmans had no real control whatever over the $14,000. That fact is not erased by using a document entitled a trust agreement.
This does not mean, however, that all or perhaps any of the interest charged on the $14,000 for the "pre-disbursement" construction period is usurious. Lyle does not require, or authorize, that conclusion. In Lyle, the amount retained by the association, and thus excluded by the Court from consideration as part of the "unpaid balance", was 75% of the total principal amount upon which interest was paid. This had the effect of making the interest paid on the whole amount far in excess of that lawfully allowed to be collected on the true "unpaid balance" of $15,000. This is evident from footnotes 2 and 3, appearing on pages 71 and 72 of the Opinion. At the time, the maximum interest rate allowed was 8%. The court computed the allowable interest, at that rate, on $45,000 as $1,637, thus making the allowable interest on *448 the actual unpaid balance of $15,000 one-third of that amount or $545. Yet, the Lyles had paid a total of $2,173  far more than that permitted by law on the $15,000 unpaid balance. That was the extent of the usury.[6]
It is apparent here (unlike the situation in Lyle) that the entire $14,000 was actually disbursed by Key Federal and the trustees at various times during the construction period. Although Key Federal is not entitled to collect interest on the $14,000 by virtue of its "disbursement" on January 29, 1976, it is entitled to begin collecting interest from the time the proceeds of the loan were disbursed by the trustees, and thus truly relinquished by the association.
Where the full proceeds of the loan have, in fact, been disbursed to the borrower, and have thus become the unpaid balance of the loan (even though they become such in stages), we have a somewhat different situation than pertained in Lyle, and we must look more specifically to the various statutes comprising the State usury law to determine whether the loan is usurious.
Commercial Law article, § 12-103 (b), as it was in effect at the time this mortgage was made, provided, in relevant part, that:
"A lender may charge interest at an effective rate of simple interest not in excess of 10 percent per annum on the unpaid principal balance of the loan if:
(i) There is a written agreement signed by the borrower which sets forth the stated rate of interest charged by the lender;
(ii) The loan is secured by a first mortgage or first deed of trust on any interest in residential real property;
(iii) There is no prepayment penalty in connection with the loan;

*449 (iv) The loan is made and the mortgage or deed of trust is executed after May 31, 1974, and before June 2, 1976;
(v) The loan is not a renewal of a loan which was made by the lender to the borrower before June 1, 1974 and which was secured by a mortgage or deed of trust on the same property; and
(vi) The lender did not issue before June 1, 1974, a written commitment agreeing to make the loan at a rate of interest of 8 percent or less." (Emphasis supplied.)
From the Amended Declaration and the exhibits to it, it would appear that the six conditions enumerated in § 12-103 (b) were satisfied; and thus, Key Federal was entitled under that section to charge interest at an effective rate of simple interest not in excess of 10% per annum. The term "effective rate of simple interest" is defined in § 12-101 (d) as "the yield to maturity rate of interest received or to be received by a lender on the face amount of a loan, computed in accordance with § 12-107 of this subtitle."
Section 12-107 addresses the situation in which a "charge or fee considered interest under this subtitle is charged at or before the inception of a loan contract." Derived from former art. 49, § 2 (b), which itself was basically a codification of a procedure set forth by the Court of Appeals in B.F. Saul Co. v. West End Park, 250 Md. 707 (1968), this section provides that, where such advance fees are involved, the effective rate of interest is to be determined by deducting the amount of those fees from the principal balance of the loan and applying the interest, excluding such fees, to the net balance of the loan. Section 12-107 does not, however, apply to the situation here, for the interest improperly charged during the time the funds remained in the trustees' account was not a charge or fee imposed "at or before the inception of [the] loan contract." It was not in the nature of "points", or loan origination fees, or similar one-time charges with which both B.F. Saul Co. and § 12-107 were directly concerned. What was collected here was not a "charge or fee considered interest" but interest itself, imposed after the inception of the loan contract.
*450 In light of this difference, it would seem that the appropriate way of determining whether this loan is usurious is to consider the combined effect of §§ 12-103 (b) and 12-101 (d), and to determine whether the total amount of interest charged during the true life of the loan, including the interest charged for the period prior to disbursement by the trustees, produces a yield to maturity in excess of 10% per annum. The note in question, attached as Exhibit 2 to the Declaration, calls for monthly payments to commence on May 1, 1976, which is the beginning of the 25-year repayment period. Reference to the published principal and interest repayment tables reveals that, even if no part of the construction period prior to May 1, 1976, were considered as part of the life of the loan (i.e., it is assumed that none of the $14,000 was disbursed until May 1, 1976), the addition of the $800 paid for the money during the construction period to the total interest payable over the 25-year remaining life of the loan would not produce an effective rate of interest in excess of 10% per annum.[7]See Bettum v. Mont. Fed. S & L Ass'n, 262 Md. 360 (1971); Montgomery Federal Savings and Loan Association v. Baer, 308 A.2d 768 (D.C.C.A., 1973).
Accordingly, the pleading, when coupled with the exhibits to it, shows on its face that the loan was not, and could not have been, usurious. For that reason, the court was correct in sustaining Key Federal's demurrer to Count I of the Amended Declaration without leave to amend.[8] Given this *451 conclusion, it is unnecessary to consider the question of whether the action should proceed as a class action under Maryland Rule 209.
Judgment affirmed; appellants to pay the costs.
NOTES
[1] The Amended Declaration contains two Counts. The court also sustained appellee's demurrer to Count II, also without leave to amend; but appellants have appealed only from the court's action with respect to Count I.
[2] The agreement did not specify whether "all monies" meant only the $14,000 proceeds of the mortgage loan or included as well all or any part of the $53,000 advanced by the Hoffmans.
[3] Md. Annot. Code, Commercial Law article, § 12-114 provides that any person who violates the usury laws of that subtitle shall forfeit to the borrower the greater of three times the amount of interest wrongfully collected, or $500, whichever is greater. Hence, the claim for $2,400.
[4] At the time Toney Schloss was decided, by virtue of then art. 66, § 3, in Baltimore County, "if the future advance under a mortgage were voluntary, it would not have priority over an intervening purchaser, mortgage or lien creditor if the mortgagee received actual notice of the rights of such third party prior to such advance; but if the advance were obligatory under the mortgage, the advance would have priority over the rights of such intervening third parties notwithstanding such actual notice." See "Comment to Former Article 21, § 7-102" appearing in Real Property article, following § 7-102. This distinction has now been repealed by Real Property article, § 7-102 (b); but, at the time, it was important to determine (1) whether the payments in question were "future advances", and (2) if so, whether they were voluntary or obligatory.
[5] It is also to be noted that the 1872 statute did not apply to deeds of trust  only to mortgages. The device in question therefore did little more than to apply, in a practical way, the benefits available to a deed of trust to a mortgage as well.
[6] Of additional significance is the fact that the rate charged on the loan was the maximum then allowed by law  8%. This meant that any interest charged in excess of that properly applicable to the $15,000 was necessarily in excess of the maximum permitted by law for the loan, and therefore usurious.
[7] Repayment of the loan over a 25-year period in equal monthly installments of $105.75 would result in a total interest payment of $17,725 ($105.75 x 300 less $14,000 principal repayment). If the $800 were added to that, the total interest payment would be $18,525, which, based on the amortization schedule published in Monthly Mortgage Payments Handbook (2nd Ed.), p. 150, would produce an effective annual interest rate of less than 8.1%  well below the maximum permitted 10%. Moreover, if the calculation is made strictly in accordance with § 12-107, based upon the appropriate schedule published in Prepayment Mortgage Yield Table for Monthly Payment Mortgages (5th Ed.), p. 375, the effective annual interest rate would be only 8.48%.
[8] We express no opinion as to whether the increase in the effective rate of simple interest occasioned by the collection of interest prior to disbursement by the trustees would result in any violation of the truth-in-lending requirements of State or Federal law as that issue was not raised by the Hoffmans in this proceeding.