PAUL R. HOFFMAN ET UX. *v.* KEY FEDERAL
SAVINGS AND LOAN ASSOCIATION

[No. 87, September Term, 1978.]

*Decided September 13, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

*Leo Howard Lubow,* with whom were *Michael L. Schwartz* and *Freishtat & Schwartz* on the brief, for appellants.

*Franklin Goldstein,* with whom were *Melnicove, Kaufman & Weiner, P.A.* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that allegations of usury presented by appellants, Paul R. Hoffman and wife, against Key Federal Savings and Loan Association should have been submitted to a trier of fact.

For purposes of our decision the facts are gleaned from the amended declaration. Prior to January 29, 1976, Key Federal issued a "construction-permanent" loan commitment to the Hoffmans for the purpose of erecting a home. Settlement was held on January 29 at which time $14,000 was paid over to the Hoffmans. They endorsed this sum to two individuals who were trustees under an agreement entered into at the same time. This trust agreement, appended to the declaration, recited that $14,000 had been borrowed from Key Federal and that a mortgage had been executed to Key Federal to secure repayment of that sum. It further stated that the mortgage proceeds had been turned over to the trustees, "to be

deposited by said Co-Trustees, in their own names, with Key Federal . . . as a pending fund to secure the erection of the aforesaid improvements and should be advanced to [the Hoffmans] during the course of the construction of said improvements in installments . . . ." The agreement then went on to provide for various payments totalling $50,500 to be made at the time of the completion of specified work insofar as the erection of the home in question was concerned. The declaration stated that in addition to the $14,000 the Hoffmans paid $53,000 to the trustees to be held by them in the trust account.[1] Examples of the payment schedule are that $10,100 was to be disbursed "[w]hen the roof and outside walls [were] sheathed and [the] house [was] completely enclosed" and $7,500 was to be paid out "[w]hen [the] roof [was] complete, [and the] plumbing, heating and electric wiring [were] roughed in." The agreement provided that if the Hoffmans stopped work for a period of 20 consecutive days or failed to have the improvements completed within nine months, the trustees, in either instance in their discretion, had the authority to use the balance of the loan "towards the cost of completing said improvements" or to pay Key Federal "on account of its aforesaid mortgage loan."

The amended declaration alleged:

> The Trustees were officers, agents and employees of Key Federal and were acting on behalf and under the control and direction of Key Federal. The monies endorsed to the Trustees were placed in a trust account subject to the sole control of the Trustees acting for and on behalf of Key Federal . . . .

The Hoffmans executed a promissory note in the amount of $14,000 payable with interest at the rate of 7¾% per annum. The note specified that it should be payable in monthly installments of $105.75 beginning on May 1, 1976, and continuing on the first day of each month thereafter until April 1, 2001. These installments included principal and

---

1. No explanation is provided for the fact that the total sum placed in the hands of the trustees is greater than the total amount of the disbursements specified in the trust agreement.

interest. Payment of the note was secured by a deed of trust covering the land upon which the home was to be erected.

The Hoffmans were "billed and paid interest on the full amount of the loan from January 29, 1976 through October, 1976, even though the monies in the trust account were partially advanced and disbursed as completion of the residential home progressed." They paid "approximately $800.00 in interest between January 29, 1976 and the date the last advance was made pursuant to the terms of the Trust Agreement." The narr. alleged that this trust agreement "was created by Key Federal merely as a subterfuge to evade the Maryland usury law," that "[t]he requirement of the payment of the interest on the full amount of the monies held in the trust account prior to their disbursement [was] in violation of [Maryland Code (1975)] § 12-101, et seq., Commercial Law Article," and that approximately $800 in "usurious and illegal interest" was in fact paid.

A second count contained allegations relative to interest on escrow funds in a context not pertinent to the issues now before the Court.

The trial judge (Haile, J.) referred to our opinion in *Tri-County Fed. S. & L. v. Lyle,* 280 Md. 69, 371 A.2d 424 (1977). In that case the borrowers executed a note and a deed of trust to a lending institution to secure the repayment of $60,000. They in fact received this sum from the lender. They paid $15,000 of the money thus obtained to the seller of the lot upon which the deed of trust was placed. The borrowers endorsed the remaining balance of $45,000 back to the lender. It then deposited that sum in the same account where its other funds were maintained. No escrow account of any kind was established. The lender charged interest on the full $60,000. The $45,000 was to be disbursed by the lender in certain installments as work progressed on a home. Judge Singley observed for the Court, "At no time was this under the Lyles' control, or under their partial control, as it might have been had it been held in escrow by others for their account, even though subject to restrictions." *Id.* at 73. In this case the trial judge observed, "[B]y dictum [*Lyle*] seems to say that . . . if the money were not in the sole control of the lender the

decision would not apply." He stated he would "decide the case on the assumption that the law of Maryland is that in a situation where the construction loan money is trusteed ... and the trustees enter into an agreement with the borrowers and certify as trustees for the borrowers ..., that the money is under the borrowers' control or at least their partial control even though subject to restrictions." Accordingly, he "sustain[ed] the argument of [Key Federal's] counsel based on the dictum in the Tri-County case in the Court of Appeals, 280 Md. 69." Because he had made this ruling, the trial judge did not rule on the second point raised by Key Federal. As the trial judge put it, this was "the contention ... that even if this money was sitting around for nine months, even if the borrowers were paying interest on it, when you add that to the seven and three-quarters percent calculated over the whole loan it is not actually usurious."

The Court of Special Appeals in *Hoffman v. Key Fed. Sav. & L. Ass'n,* 40 Md. App. 438, 392 A.2d 1121 (1978), affirmed the judgment below. However, it did so on the basis of the second contention to the trial judge, that over the entire 25-year life of the deed of trust the effective rate of interest would be less than the statutory maximum of 10%.

Hoffman petitioned us for the writ of certiorari, posing the question of "[w]hether the lower court erred in holding that Key Federal ... did not practice usury when it charged interest on a sum not part of an unpaid balance." Key Federal filed an answer and a conditional cross-petition. See Maryland Rule 813 a. In the cross-petition we were asked to address the question of whether the Court of Special Appeals had "incorrectly reject[ed] the decision of the Circuit Court for Baltimore County that the Amended Declaration and the exhibits in this case establish as a matter of law that the $14,000.00 of construction money was held in escrow for the Hoffmans by their Trustees, under a Trust Agreement and, therefore, was part of the unpaid balance." We granted the writ in order that we might consider both questions.

For the purpose of determining whether a trial judge has erred in sustaining a demurrer without leave to amend we are required to assume the truth of all material facts which are

well pleaded as well as all inferences which can reasonably be drawn from those well pleaded facts. *Arnold v. Carafides,* 282 Md. 375, 382, 384 A.2d 729 (1978); *Krieger v. J. E. Greiner Co.,* 282 Md. 50, 52, 382 A.2d 1069 (1978); *Zion Evang. Luth. Ch. v. St. Hwy. Adm.,* 276 Md. 630, 632, 350 A.2d 125 (1976); and *Schwartz v. Merchants Mort. Co.,* 272 Md. 305, 307-08, 322 A.2d 544 (1974).

In considering this case we first note two opinions of our predecessors, *Plitt v. Kaufman,* 188 Md. 606, 53 A.2d 673 (1947), and *Andrews v. Poe,* 30 Md. 485 (1869). In *Plitt* Judge Delaplaine said for the Court:

> This Court has held that no device or subterfuge of the lender will be permitted to shield him in taking more than the legal interest on a loan. In whatever part of the transaction usury may lurk, or in whatever form it may take, or under whatever guise the lender may attempt to evade the law, the court will seek to ascertain what the contract actually was between the parties and give the debtor relief. *Andrews v. Poe,* 30 Md. 485; *Brenner v. Plitt,* 182 Md. 348, 34 A.2d 853 [(1943)]. [*Id.* 188 Md. at 611.]

In *Andrews* Judge Robinson said for the Court:

> Now, if there be a principle clearly established by judicial decision, it is that the laws against usury ought to be strictly enforced. Such, indeed, has been the uniform course of decisions under statutes penal in their character, and by which the usurious contract was wholly avoided, or the userer visited with the penalties of the law; and there is certainly no reason why, in this State, the law should be less rigidly enforced, where no contract is set aside or penalty imposed, but the excessive interest alone forfeited. It has so happened, from the earliest times to the present, that every device and shift which the wit of man could suggest, have been invoked to exempt contracts for illegal interest from the operation of the law, but courts have not hesitated, in every case, to tear off, with unsparing hands, the

mask under which it has been attempted to conceal the usury, and to declare the true nature of the transaction. [*Id.* 30 Md. at 487.]

To place matters in better perspective it must be noted that in *Lyle* Judge Singley said for the Court:

We are entirely in accord with the concept adopted by the Court of Special Appeals, that whether a loan is usurious depends on the collection of interest on the unpaid balance at a rate greater than that permitted by statute, and that the balance clearly means that which is owed by a borrower to a lender. Webster's New International Dictionary of the English Language 206 (2d ed. 1949) defines balance as "An equality between the sums total of the two sides of an account," or alternatively as "The excess on either side, or the difference between the two sides, of an account."

\* \* \*

Here the "unpaid balance" referred to by Art. 49, § 3 was the $15,000.00 owed by the Lyles to Tri-County; the $45,000.00 was a balance beyond their control to which they had no access until they commenced the construction of their house. So long as it remained in the sole control of Tri-County, and was not utilized by the Lyles, the imposition of the interest charged was usurious, because the $45,000.00 was not and could not be a part of the unpaid balance of the loan to the Lyles. [*Id.* 280 Md. at 75-76.]

Maryland Code (1957, 1968 Repl. Vol., 1969 Cum. Supp.) Art. 49, § 3, which governed in *Lyle* and *B. F. Saul Co. v. West End Park,* 250 Md. 707, 246 A.2d 591 (1968), forbade charging interest in excess of six percent "on the unpaid balance, except that interest m[ight] be charged at the rate not in excess of eight percent (8%) per annum simple interest on the unpaid balance under an agreement in writing between the lender and the borrower." In the case at bar Judge Wilner

noted for the Court of Special Appeals that the maximum permissible rate of interest at the time of the *Lyle* loan was eight percent, which was the amount specified in the loan. Accordingly, the court reasoned that if interest had been charged in *Lyle* on an amount which had not yet been advanced, then the yield to maturity rate would have been in excess of 8%, unlike the situation here where the maximum permissible rate of interest is 10%, the amount called for in the loan is 7¾%, and the interest charged on funds which had not been advanced (if such in fact be the case) would have made a yield to maturity rate of less than 10%. Thus, the Court of Special Appeals found *Lyle* not controlling, a conception with which we disagree.

According to the schedule published by Financial Publishing Company of Boston, Massachusetts, and relied upon by many lending institutions, a loan of $14,000 to be repaid, as was this one, in equal consecutive monthly installments of $105.75, intended to cover interest and principal, over a period of 25 years would be at the rate of seven and three-quarters percent. Thus, it is obvious that, as concluded by the Court of Special Appeals, if this mortgage went to its maximum of 25 years, there is no way the total interest paid would equal a rate in excess of 10 percent per annum even if, as alleged, interest was charged for a few months on money which had not yet been advanced. We do not regard that as determinative, however, for reasons which we shall hereafter develop.

We have found no case directly in point. On the issue before the Court *see generally* 45 Am. Jur. 2d *Interest and Usury* §§ 113 and 181 (1969); 91 C.J.S. *Usury* § 35 (1955); Annot., 76 A.L.R. 1467 (1932); and Annot., 12 A.L.R. 1422 (1921). *Williamson v. Clark,* 120 So. 2d 637 (Fla. App. 1960), is factually analogous to *Lyle* and has a similar holding. *See also Mindlin v. Davis,* 74 So. 2d 789 (Fla. 1954).

In *B. F. Saul Co., supra,* 250 Md. 707, the Court was concerned, among other things, with whether in a situation where points had been charged at the inception of a loan the voluntary prepayment of the loan before the maturity date specified in the loan instrument would cause the transaction

to be usurious. In that context Judge Finan said for the Court, "[T]he transaction is not usurious as long as the interim payments of the effective interest rate would have been legal in contemplation of continued payments to the maturity specified in the contract." *Id.* at 719. The virtually universal rule is that a contract legal at its inception will not be rendered usurious by voluntary prepayment. *See, e.g.,* 45 Am. Jur. 2d *Interest and Usury* §§ 184, 185 (1969), and the cases collected and analyzed in Annots., 75 A.L.R.2d 1265, §§ 2 and 3 (1961), and 130 A.L.R. 73, § II (1941).

The present usury statute is but a recodification of the law which was applicable in *Lyle* and was before the Court in *B. F. Saul.* Our predecessors observed in *Welch v. Humphrey,* 200 Md. 410, 417, 90 A.2d 686 (1952), citing *Welsh v. Kuntz,* 196 Md. 86, 97, 75 A.2d 343 (1950), that recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code. Maryland Code (1975) § 12-101 (k), Commercial Law Article, defines "usury" as "[t]he charging of interest by a lender in an amount which is greater than that allowed by [the Subtitle, 'Interest and Usury' of that Article]." At the time here relevant § 12-103 (b) provided as to residential real property that the maximum permissible rate of interest was "an effective rate of simple interest not in excess of 10 percent per annum *on the unpaid principal balance of a loan . . . .*" (Emphasis added.) The term "effective rate of simple interest" is defined in § 12-101 (d) as "the yield to maturity rate of interest received or to be received by a lender on the face amount of a loan, *computed in accordance with § 12-107 . . . .*" (Emphasis added.) The latter section states:

> If a charge or fee considered interest under this subtitle is charged at or before the inception of a loan contract, the effective rate of simple interest permitted to be charged by §§ 12-102 and 12-103 of

this subtitle [(referring to the general legal rate of interest of 6% and "other permitted rates of interest," respectively)], and required to be disclosed by § 12-106 of this subtitle shall be determined in the same manner as if the fee or charge had not been charged, except that the principal of the loan used in determining the rate of interest is the face amount of the loan less the fee or charge.

The revisor's note to § 12-101 (d) states:

This subsection is new language added to clarify the meaning of the term "effective rate of simple interest" as used in this subtitle. It combines without substantive change the definition of that term contained in B. F. Saul Co. v. West End Park N., Inc., 250 Md. 707, 717 (1968), and, by cross-reference, provisions of former Article 49, § 2 (b) — now § 12-107 of this subtitle — which relate to the computation of the interest rate when charges are assessed at the inception of a loan.

The prior law found in Code (1957, 1968 Repl. Vol., 1969 Cum. Supp.) Art. 49, § 2 (b) is virtually identical with present § 12-107. It was the proper interpretation of this section with which the Court was concerned in *B. F. Saul Co.* where Judge Finan said for the Court:

Let us assume that the borrower has applied for a loan of $10,000 bearing interest at the rate of six per cent (6%), with the interest and unpaid balance being paid in fixed monthly installments over a period of twenty (20) years, with a charge of five "points" being deducted by the lender. This $10,000 loan with five "points" charged results in a five per cent (5%) discount applied to the principal sum and yields a $9,500 net loan to the borrower.[3]

The borrower who thus receives a net of $9,500 after deducting five "points" and pays back $10,000, plus interest, in monthly installments over twenty (20) years is not paying the $500 deducted from the

face amount of the loan in the first year but is paying a small portion of this each month over the entire twenty (20) years.

The determinative factor as to whether or not the interest in such a case is usurious is the annual effective rate of interest (not to be confused with the term "stated interest"). If the annual effective rate of interest does not exceed eight per cent (8%) then it is not usurious and this annual effective rate of interest is computed as follows, again borrowing the example used by the court below:

"The dollar amount of interest payable during the life of the loan is ascertained by multiplying the amount of each monthly payment by the number of months and subtracting the net principal of the loan. Hence, in the case of a $10,000 loan at six per cent (6%) with five points deducted, payable over 20 years, with the fixed monthly payment of $71.65:

$71.65 X 240 (20 years X 12 mos.)= . . . $17,196.00 total paid by borrower

Less net loan after subtracting points deducted . . . . . . . . . . . . . . . . . . . . . . .9,500.00

Total dollar amount of interest paid for the use of $9,500.00 during life of loan . . .7,696.00

The stated rate of interest in the note itself is . . . . 6%

The current yield to the lender, who receives interest at the rate of $600.00 per year for a $9,500.00 loan, is $9,500.00 divided into $600.00=. . . . 6.31%

But because the lender not only receives a current yield of 6.31% but during the life of the loan also receives back the $500.00 deducted from the face amount of the loan, he has a yield to maturity of . . . . 6.65%" [4]

(6.65% being the annual effective rate of interest)

The 6.65% annual yield to maturity set forth in the above example is the annual effective rate of interest and is not usurious.[5] Adopting the validity of the above illustration this Court concludes that the charge of a fee, commonly called "points" made at the inception of the loan, should not be considered interest paid in the initial year of the loan but is to be computed or spread over the term of the loan. [*Id.* 250 Md. at 715-16.]

In footnotes 3, 4, and 5 of that opinion it was stated:

**3.** Section 2B of the Act: "In the event that charges or fees which, under this Article are deemed interest, are assessed at the inception of the contract of indebtedness, the rate of interest required in Section 10 of this Article shall be determined in the same manner as if fees and charges had not been assessed except that the principal of the loan used in determining the rate of interest shall be the face value of the loan less any fees or charges which are interest." [*Id.* at 715.]

**4.** Yield figure obtained from "Prepayment Mortgage Yield Table for Monthly Payment Mortgages," Sec. Ed., p. 338.

**5.** Were the 5 points to have been construed as interest during the initial year of the loan the transaction would be usurious as the interest during the first year would have been 11%. [*Id.* at 716.]

In *B. F. Saul,* 250 Md. at 718, in interpreting the application of then § 2 (b) the Court equated the term "effective annual interest rate" (which obviously is the same as "annual effective rate of interest") with the term "yield to maturity." As we have already pointed out, *B. F. Saul* was concerned with points.[2] It was in the context of points that "yield to

---

2. This term is defined in Code (1975) § 12-101 (h), Commercial Law Article, as meaning "a fee, premium, bonus, loan origination fee, service charge, or any other charge equal to 1 per cent of the principal amount of a loan which is charged by the lender at or before the time the loan is made as additional compensation for the loan."

maturity" was used and that the Court stated that a prepayment would not make usurious that which would not be usurious but for prepayment. We did not have a situation there such as in *Lyle* where interest was being collected on money which had not been made available to the borrowers.

Key Federal suggests in its brief that the formula supplied in § 12-107 concerning computation of interest for points is here applicable. It is not, because that section refers to "a charge or fee considered interest . . . charged at or before the inception of a loan contract . . . ." What is here before the Court is an interest charge made subsequent to the inception of the loan contract. That section is an effective answer, however, to the concern of the Hoffmans that a lending institution "theoretically could charge as interest in advance of a loan . . . an amount exceeding the principal actually loaned" since by that section such an amount would be subtracted from the face amount of the loan for the purpose of computation of interest. This obviously would create a negative balance.

If we were to hold as did the Court of Special Appeals that in determining whether the charges were usurious we should examine the total interest charges during the entire 25 year portion of the loan, then we would be met with the contention set forth by the Hoffmans in their brief:

> [U]nder [this] rationale . . . an interest charge of 50% per annum or 60% per annum or more is permissible *in any given year* of a long-term loan if a smaller amount of interest is charged in later years of the loan (by which time the lender already will have recovered well in excess of the principal loaned). Such an analysis is very much like reasoning that if one who must travel 600 miles drives 375 m.p.h. in the first hour and 25 m.p.h. for each of the next nine hours, a permissible rate of 60 m.p.h. has been achieved. [Emphasis in brief.]

Key Federal counters this argument by saying, "With the full disclosure required under Truth-In-Lending, this would only happen if the borrower wanted it to happen." This is not a

satisfactory answer because down through history numerous cases involving usury have reached the courts where initially "the borrower wanted it to happen" at the time he was obtaining the loan, often being desperate for the money borrowed. Litigation ensued when he thought better of it, realized he had been victimized, and sought assistance from the courts. We are unable effectively to counter the Hoffmans' argument as to the possibilities for mischief by determining the presence or absence of usury by a computation of yield to maturity. As Judge Eldridge said for the Court in *Curtis v. State,* 284 Md. 132, 149, 395 A.2d 464 (1978), citing a number of our prior cases, "One of the basic principles of statutory construction is that a statute should not be construed to lead to an unreasonable or illogical result." Given the expressions of our predecessors concerning protecting borrowers, it would indeed be an absurd result to hold that the term "yield to maturity rate of interest received or to be received by a lender on the face amount of a loan, computed in accordance with § 12-107" means that where interest is charged on money not advanced as in *Lyle,* and thus not a part of the balance due from the borrower to the lender, interest should be computed over the entire life of the transaction to determine the presence or absence of usury. Thus, we are obliged to examine further the statute in question.

Rules for statutory construction include ascertaining and carrying out the real intent of the Legislature; that the primary source from which we glean the intention is the language of the statute itself; that in construing a statute we accord the words their ordinary and natural signification; that, if reasonably possible, a statute is to be read so that no word, phrase, clause, or sentence is rendered surplusage or meaningless; and that if a statute is a part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the General Assembly. *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 684, 393 A.2d 181 (1978); *Mazor v. State, Dep't of Correction,* 279 Md. 355, 360-61, 369 A.2d 82 (1977), and cases there cited. *See also Mauzy v. Hornbeck,* 285 Md. 84, 92-93, 400 A.2d 1091 (1979).

Given the fact that "yield to maturity rate of interest" as used in *B. F. Saul* concerned points or other charges at the inception of the loan; that when the term is used in the definition in § 12-101 (d) the statement is made, "computed in accordance with § 12-107," which refers to points; that, as we have previously said, codification or recodification of the law is not intended to change the prior law unless this intent appears unmistakably from the language of the Code; that the present statutory limitation has to do with a given rate "on the unpaid principal balance of the loan," which is virtually the same as the provision in former Art. 49, § 3 before the Court in *Lyle* referring to "interest on the unpaid balance," and that only by such a construction may we avoid the absurd, illogical, and unreasonable result posited by the Hoffmans, we conclude that the term "yield to maturity rate of interest" refers only to a computation to be made where points or other charges are made at the inception of the loan. In accordance with our holding in *Lyle,* we further conclude that under the statute now before the Court interest charged may not exceed 10% on the sum due at any given time from the borrower to the lender. We are reinforced in this point of view by the fact that in a loan transaction such as this, unless it be "subject to the disclosure provisions of the federal Truth-in-Lending Act," § 12-106 (b) requires that "[b]efore the execution of a loan contract, the lender shall furnish to the borrower a written statement" setting forth a number of things, including the total principal amount of the loan, the total amount of interest to be paid, the annual effective rate of simple interest charged "stated in percentage calculated to the nearest 0.2 percent," and an itemized amount of payments in addition to interest payable to the lender in connection with the loan at the time the loan is made, all of which is to be "stated in dollars." Given a situation such as this where the time for such disbursements as the $10,100 was to be when the roof and outside walls were sheathed and the house completely enclosed, it would be an utter impossibility prior to such payment to compute interest to the date of maturity were we to follow the formula espoused by the Court of Special Appeals. Thus, it becomes relevant to

determine the actual sum due from the Hoffmans to Key Federal.

Key Federal has relied from the beginning upon *Toney Schloss v. Union Federal,* 233 Md. 224, 196 A.2d 458 (1964), which in turn rested upon a number of the prior cases of this Court such as *Goertz v. Backman,* 195 Md. 450, 74 A.2d 3 (1950); *Neeb v. Atlantic Mill etc. Co.,* 176 Md. 297, 5 A.2d 283 (1939); *White Eagle, etc., Bldg. & Loan Assn. v. Lumber Co.,* 168 Md. 199, 178 A. 214 (1935); *New Balto. Loan & Savings Assn. v. Tracey,* 142 Md. 211, 120 A. 441 (1923); *Western Nat'l Bank v. Jenkins,* 131 Md. 239, 101 A. 667 (1917); and *Edelhoff v. Horner-Miller Mfg. Co.,* 86 Md. 595, 39 A. 314 (1898).

In *Toney Schloss* the full amount of the recited principal of a mortgage was paid by the mortgagee to the mortgagor. Judge Prescott said for the Court:

> [This sum was] deposited ... with two trustees under the terms of a collateral trust agreement. One of the trustees was an officer of appellee and the other was associated with the firm of attorneys which represented it. Their duty under the agreement was to release the fund to the mortgagor in fixed stages as construction of improvements upon the three lots progressed. [*Id.* at 227.]

The lien of the subsequent advances was attacked with the argument, "[I]t is settled in Maryland that when a lender under a mortgage ... to secure future advances, with actual knowledge of an [intervening] mortgage ... of a third person, voluntarily makes an advance he could not have been compelled to make, that as to such voluntary advance the claim of the lender is inferior to the third party's mortgage ...." The Court agreed with this statement of the law and reaffirmed its holdings to such effect. It said, however, "[W]e are unable to concur in the claim that the factual situation in the instant case brings it within the ambit of the rule stated." These various cases concerned the application of Code (1957) Art. 66, § 2 which then provided in pertinent part:

> No mortgage ... shall be a lien or charge on any

estate or property for any other or different principal sum ... of money than the principal sum ... that shall appear on the face of such mortgage and be specified and recited therein, and particularly mentioned and expressed to be secured thereby at the time of executing the same; and, except as is hereinafter provided, no mortgage ... shall be a lien or charge for any sum ... of money to be loaned or advanced after the same is executed, except from the time said loan or advance shall be actually made; and, except as is hereinafter provided, no mortgage to secure future loans or advances shall be valid unless the amount or amounts of the same and the times when they are to be made shall be specifically stated in said mortgage .... Provided, however, that any mortgage, if it so recites, may secure future advances to be made at the mortgagee's option, prior to the full payment of the mortgage debt but not to exceed in the aggregate the sum of fifteen hundred dollars ($1,500) nor to be made in an amount which would make the mortgage debt exceed the original amount thereof; and all such future advances so made shall be liens and shall be secured by such mortgage equally and to the same extent as the amount originally advanced on the security of such mortgage, and all such future advances shall be a lien on the property therein described as of the date of the original mortgage, good and valid against and superior to all rights of subsequent creditors, purchasers, mortgagees, and other lienors and encumbrances, and any of them, provided the full amount of any such advance is used for paying the cost of any repair, alterations or improvements to the mortgaged property.

It will be seen that the effect of this statute is to forbid a mortgage to secure a future advance except (1) where the date and amount of the future advance is specifically spelled out in the instrument, or (2) if the mortgage by its terms provides for future advances not to exceed $1,500 for paying

the cost of any repair, etc., to the mortgaged property, with the further limitation that in such latter instance the total indebtedness after the future advance may not exceed the original amount of the mortgage.

Judge Prescott pointed out for the Court in *Toney Schloss* that Art. 66, § 2, before the Court in *Western Nat'l Bank,* did not apply to Baltimore County by reason of § 3. (*Toney Schloss* arose in that county.) He went on to say, however, in footnote 1 on page 230, "This case and those to follow are pertinent, however, in determining what is a mortgage for 'future advances.'" In *Toney Schloss* the Court cited and quoted extensively from *Maryland Mortgages for Future Advances,* 4 Md. L. Rev. 111 (1940), by R. Dorsey Watkins, then a practicing lawyer in Baltimore City and Lecturer on Torts, Suretyship, and Mortgages, University of Maryland School of Law. He is now a senior United States District Judge. The Court held "that the money loaned by the appellee to the mortgagor was money presently loaned and it did not constitute future advances; consequently its deed of trust was a lien for the full amount of the consideration named therein from the time of its recordation, unless there be some rule of law or equity that subordinates it to the security held by the appellant." *Id.* 233 Md. at 233. It found none.

The Court of Special Appeals considered and discounted *Toney Schloss* which it said

> has a certain facial appeal: if, under *Toney Schloss* (and a number of cases that preceded it), the full amount of the loan proceeds are considered to be "presently loaned" when disbursed at time of settlement, notwithstanding their immediate deposit under a trust agreement, surely they must also constitute the "unpaid balance" owed as of then. This argument overlooks, however, the very different considerations involved in the two types of situations. [*Hoffman v. Key Fed. Sav. & L. Ass'n, supra,* 40 Md. App. at 444.]

As Judge Digges observed for the Court in *Barry Properties v. Fick Bros.,* 277 Md. 15, 18, 353 A.2d 222 (1976),

our then mechanics' lien law, Code (1974, 1975 Cum. Supp.) §§ 9-101 to -111, Real Property Article, is a lineal descendant of Chapter 205 of the Acts of 1838. It must not be forgotten that from the time of the 1838 enactment such liens for labor and material for the erection of buildings were preferred to all liens attaching upon such buildings or the ground covered thereby subsequent to the commencement of the building "and all the mortgages and liens other than liens which h[ad] attached thereto prior to the commencement of the said building and which by the laws of this State are required to be recorded [are to] be postponed to said lien, unless recorded prior to the commencement of said building." This became codified in Code (1957) Art. 63, § 15 and subsequently in Code (1974) § 9-107, Real Property Article. It remained the law of Maryland until our decision in *Barry Properties* where we struck down the lien created under the mechanics' lien law by virtue of the decisions in *North Georgia Finishing, Inc. v. Di-Chem., Inc.,* 419 U.S. 601, 95 S. Ct. 719, 42 L. Ed. 2d 751 (1975); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S. Ct. 1895, 40 L. Ed. 2d 406 (1974); and *Fuentes v. Shevin,* 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972). Thus, many lending institutions used escrow accounts such as that here in controversy in making loans for the construction of buildings because it was essential that they have a first lien and they desired to avoid the possibility of a mechanics' lien creeping in ahead of their lien.

The facts in *Western Nat'l Bank v. Jenkins, supra,* are strikingly similar to this case. The contest there concerned the relative priority of mortgages. The mortgage to Jenkins was executed first. It was challenged on the ground that it was to secure future advances. The relevant facts may be gleaned from the opinion where Judge Burke said for the Court:

> The facts show that Mr. Jenkins passed over to the mortgagor at the time of the execution of the mortgage the entire consideration stated in the mortgage, and took the promissory note of the mortgagor for that sum. It was not contemplated or suggested that he should make any further loans. The money was turned over to Mr. Shriver, trustee,

to be held and applied by him in the construction of the buildings under the terms of the agreement of October 4, 1911, and the entire amount of the mortgage loan has been so applied. The trustee was holding the money in trust for the parties. The use, and possession, and dominion over the money had passed from Mr. Jenkins. Whose money was it that the trustee was holding? Certainly it did not belong to Mr. Jenkins. That it was really the money of the Realty Company which it had borrowed from Mr. Jenkins, and which the trustee was holding for its benefit under the provisions of the trust agreement is shown by the fact that it received from the trustee more than $40,000 of the fund prior to the commencement of this litigation, and has since secured the application of the whole balance to the completion of the houses. Mr. Jenkins contemplated and entered into no scheme to evade the law, as was done in *Baltimore High Grade Brick Co. v. Amos,* 95 Md. 571, which, upon the controlling facts, was wholly and entirely different from the facts appearing in this record. We, therefore, hold that the Jenkins mortgage is not a mortgage to secure future loans or advances within the meaning of *Section 2, Article 66 of the Code,* and that it constituted a first lien upon the mortgaged property. [*Id.* 131 Md. at 252-53.]

*See also In re Shapiro,* 34 F. Supp. 737, 738 (D. Md. 1940), *aff'd sub nom. Schumacher & Seiler v. Sandler,* 118 F.2d 348 (4th Cir. 1941), in which Judge Chesnut called *High Grade Brick Co. v. Amos,* 95 Md. 571, 52 A. 582, 53 A. 148 (1902), "[t]he leading case in Maryland [on the point of mortgages to secure future advances]." It is not contrary to our holding here.

We consider *Toney Schloss* and its predecessor cases to be controlling here if there was in fact a bona fide escrow agreement. Under these cases if money was paid into a legitimate escrow fund and then disbursed to or on behalf of a borrower pursuant to an established schedule, a future advance was not made in contravention of the then statute.

It thus must follow as day follows night that since such funds were advanced at the inception of the loan they become a part of the balance due from the mortgagor to the mortgagee. Accordingly, it is not improper to charge interest on the full amount thus loaned. We regard as particularly persuasive the comment of Judge Watkins which in part is reflected in the reasoning of the Court in *Western Nat'l Bank:*

> Although analogies, particularly when drawn from another field, are dangerous, yet might not the question of whether the funds alleged to be held by the mortgagee are really those of the mortgagor, in the custody of the mortgagee, or simply a promise to advance in the future, be tested by the consequence of an unjustifiable failure by the mortgagee to make payments in accordance with the schedule? In the former case this would probably constitute embezzlement; in the latter, simply breach of contract. [Watkins, *Maryland Mortgages For Future Advances, supra,* 4 Md. L. Rev. at 130, n. 66.]

*Toney Schloss* was tried. Here the case was decided on demurrer. Where the trial judge fell into error was in assuming for the purpose of his ruling that the escrow account was legitimate when the plaintiffs were contending that it was anything but legitimate. In the posture of this case this money has been placed with trustees who "were officers, agents and employees of Key Federal and were acting on behalf and under the control and direction of Key Federal. The monies . . . [have been] placed in a trust account subject to the sole control of the Trustees acting for and on behalf of Key Federal . . . ."

We are of the view that the Hoffmans are entitled to an opportunity to prove their allegations. Thus, the case must be remanded for trial. If the Hoffmans establish that a bona fide escrow agreement did not exist, then so long as the $14,000 in question or any part of it was solely under the control of Key Federal such sum could not be a part of "the unpaid balance" and it would be improper for interest to be collected upon it.

In summary, we here hold that the statutory term "yield to maturity rate of interest received or to be received by a lender on the face amount of a loan" as applied for determination of whether usury is present is applicable only to points or other charges made at the inception of the loan. The sum charged by a lender to a borrower by way of interest may not exceed the statutorily permissible rate, 10% in this instance, upon the amount then due from the borrower to the lender. If as in such cases as *Toney Schloss,* a bona fide escrow agreement has been entered into and the borrowers have delivered the sum loaned to a bona fide escrow agent, then a lending institution may charge interest at the statutory maximum on the full amount loaned by it to the borrowers and by them delivered to the escrow agent. On the other hand, if a lender has in effect disbursed but a part of the loan proceeds to a borrower as took place in *Lyle,* then the lender may collect interest not in excess of the statutory rate only upon the part actually disbursed.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for passage of an order reversing the judgment of the Circuit Court for Baltimore County and remanding the case to that court for trial subject to the views expressed in this opinion; costs to abide the final result.*